[No. S118489. June 16, 2005.]

JOHANA GOMEZ, as Administrator, etc., Petitioner, v.
THE SUPERIOR COURT OF LOS ANGELES COUNTY, Respondent;
THE WALT DISNEY COMPANY et al., Real Parties in Interest.

## Counsel

Barry B. Novack for Petitioner.

No appearance for Respondent.

Snell & Wilmer, Richard A. Derevan and Janet L. Hickson for Real Parties in Interest.

Gibson, Dunn & Crutcher, Scott A. Edelman and Christopher Chorba for California Attractions and Parks Association and International Association of Amusement Parks & Attractions as Amici Curiae on behalf of Real Parties in Interest.

Miles & Stockbridge, R. Wayne Pierce; Gordon & Rees and Stephen T. Waimey for Outdoor Amusement Business Association, Inc., World Waterpark Association, Inc., American Karting & Park Association, Inc., American Specialty Companies, Inc, Six Flags, Inc., International Amusement & Leisure Entertainment Industries, Inc., Western Fairs Association, California Fairs Alliance, California Fair Services Authority and Paradise Island Amusement Park as Amici Curiae on behalf of Real Parties in Interest.

## OPINION

**MORENO, J.**—The estate of a passenger who died as a result of injuries allegedly sustained while riding on the Indiana Jones attraction at Disneyland brought causes of action based upon Civil Code section 2100, which requires a "carrier of persons for reward" to "use the utmost care and diligence" for the safety of its passengers, and Civil Code section 2101, which imposes a duty upon such a carrier to provide "vehicles" that are "safe and fit for the purposes to which they are put." The superior court sustained a demurrer to these causes of action, reasoning that the operator of an amusement park ride cannot be a carrier of persons, but the Court of Appeal reversed.

For the reasons that follow, we agree with the Court of Appeal and conclude that the operator of a roller coaster or similar amusement park ride can be a carrier of persons for reward within the meaning of Civil Code sections 2100 and 2101.

### FACTS AND PROCEDURAL HISTORY

On September 3, 2002, the estate of Cristina Moreno and her heirs filed a second amended complaint for wrongful death and damages against The Walt Disney Company and related defendants (hereafter Disney) alleging that Moreno suffered a brain injury and eventually died after riding on the Indiana Jones amusement ride at Disneyland in Anaheim, California. Plaintiffs alleged that on June 25, 2000, Moreno was 23 years old and had traveled from her home in Spain with her new husband on their honeymoon and rode on the Indiana Jones amusement ride, during which Moreno "suffered serious injuries due to the violent shaking and stresses imposed by the ride." Plaintiffs alleged that "[a]s a proximate cause of this incident, [Moreno] sustained injuries including a subarachnoid hemorrhage and hydrocephalus which required extensive hospitalization and multiple brain surgeries. The charges alone for the initial hospitalization and air ambulance to Spain are in excess of $1,365,000.00." Moreno died on September 1, 2000.

Plaintiffs alleged that the Indiana Jones attraction has been in operation from at least 1995 and utilizes "jeep-style ride vehicles" that are "computer controlled with 160,000 different combinations. The ride is fast, turbulent, combining the ups and downs of a roller coaster with jarring jumps, drops, and unpredictable movements. The $100 million Indiana Jones Attraction at Disneyland shakes and whipsaws riders with such fury that many passengers are forced to seek first aid and in some instances hospitalization." They alleged that the ride's sudden changes in direction could cause, and did cause, bleeding in the brain "similar to what happens in 'shaken-baby syndrome.' "

In addition to causes of action for premises liability, "product negligence," strict products liability, and unfair business practices, plaintiffs brought a cause of action under Civil Code section 2100 for "common carrier liability," alleging that Disney owed Moreno a "duty of utmost care and diligence" because the Indiana Jones attraction consists of a "vehicle" that was "used to transport passengers while, at the same time, providing them with entertainment and thrills." Plaintiffs also brought a cause of action under Civil Code section 2101 for "strict liability," alleging that Disney failed to "provide a vehicle safe and fit for transportation and are not excused for default in this regard by any degree of care."

Disney filed a demurrer to the second amended complaint challenging the causes of action based upon Civil Code sections 2100 and 2101. The court sustained the demurrer without leave to amend on the grounds "that amusement rides such as roller coasters are not common carriers. . . . Here, the primary purpose of the ride is entertainment, thrills, and the incidental consequence is that people are transported in the process."

The Court of Appeal granted plaintiffs' petition for writ of mandate and directed the superior court to overrule the demurrer on the ground that Disney acted as a common carrier in operating the Indiana Jones attraction because Disney "offers to the public to carry persons." We granted Disney's petition for review.

### DISCUSSION

Carriers of persons for reward have long been subject to a heightened duty of care. (3 Harper & James, The Law of Torts (2d ed. 1986) The Nature of Negligence, § 16.14, p. 506.) This heightened duty imposed upon carriers of persons for reward stems from the English common law rule that common carriers of goods were absolutely responsible for the loss of, or damage to, such goods. (Beale, *The History of the Carrier's Liability* in Selected Essays

in Anglo-American Legal History (Assn. of Am. Law Schools, edit., 1909) p. 148.) Carriers of goods are bailees and, at "early law goods bailed were absolutely at the risk of the bailee." (*Ibid.*) Thus, carriers of goods for reward were " 'responsible absolutely for the goods delivered, even when lost by theft, and regardless of negligence.' " (*Id.* at p. 149, fn. 4.) This rule was applied in California in *Agnew v. Steamer Contra Costa* (1865) 27 Cal. 425, 429, which held that a common carrier of goods (in that case a horse), "was an insurer against all injury not resulting from the act of God or the public enemies, or from the conduct of the animal."[1]

The precursor to recognizing a heightened duty of care for carriers of persons came in 1680, when an English court applied the rule regarding carriers of goods to personal property that a passenger on a stagecoach had delivered to the driver, but which the driver failed to return at the end of the journey. (*Lovett v. Hobbs* (1680) 89 Eng. Rep. 836.) The court rejected the argument that the driver of a stagecoach could not be a common carrier regarding property brought by a passenger, stating: "[I]f a coachman commonly carry goods, and take money for so doing, he will be in the same case with a common carrier, and is a carrier for that purpose, whether the goods are a passenger's or a stranger's . . . ." (*Id.* at p. 837.) The extension of applying the heightened duty of care for carriers of goods to carriers of persons for reward "is probably of American origin, finding its earliest expression in 1839 in *Stokes v. Saltonstall* [(1839) 38 U.S. 181 [10 L.Ed. 115]]." (3 Harper & James, The Law of Torts, *supra*, The Nature of Negligence, § 16.14, p. 507.) In *Stokes*, a passenger in a stagecoach was injured when the coach was upset. The court noted that a carrier of goods was absolutely liable for the loss of or damage to such goods regardless of the cause "except the act of God, and the public enemy," but recognized that "a contract to carry passengers differs from a contract to carry goods." (*Stokes*, *supra*, 38 U.S. at p. 191.) "But although he does not warrant the safety of the passengers, at all events, yet his undertaking and liability as to them, go to this extent: that he . . . shall possess competent skill; and that as far as human care and foresight can go, he will transport them safely." (*Ibid.*) Restating this standard, the court required the driver to act "with reasonable skill, and with the utmost prudence and caution." (*Id.* at p. 193.)

---

[1] The liability of a common carrier of property currently is governed by Civil Code section 2194, which provides that "an inland common carrier of property is liable . . . for the loss or injury thereof from any cause whatever, except: [¶] 1. An inherent defect, vice, or weakness, or a spontaneous action, of the property itself; [¶] 2. The act of a public enemy of the United States, or of this State; [¶] 3. The act of the law; or, [¶] 4. Any irresistible superhuman cause." Civil Code section 2195 provides further that "[a] common carrier is liable, even in the cases excepted by the last section, if his want of ordinary care exposes the property to the cause of the loss."

The rule that carriers of persons for reward must exercise great care for the safety of their passengers was adopted in California in 1859 in *Fairchild v. The California Stage Company* (1859) 13 Cal. 599, in which a passenger was injured when the stagecoach in which she was riding overturned. The court rejected the proposition that a carrier of persons for reward warrants the safety of its passengers, but held the carrier to a high duty of care: "While it is true that the proprietors of a stage-coach do not warrant the safety of passengers in the same sense that they warrant the safe carriage of goods, yet they do warrant that safety so far as to covenant for the exercise of extraordinary diligence and care to insure it; and they do this as common carriers." (*Id.* at p. 605.)

The California Legislature soon adopted a comprehensive scheme governing carriage. Civil Code section 2085,[2] which was enacted in 1872 and remains unchanged today, defines a "contract of carriage" in extremely broad terms as "a contract for the conveyance of property, persons, or messages, from one place to another." Similarly, section 2168 defines a "common carrier" in expansive terms: "Every one who offers to the public to carry persons, property, or messages, excepting only telegraphic messages, is a common carrier of whatever he thus offers to carry."

■ Carriers of persons are treated differently under the statutory scheme depending upon whether they act gratuitously or are paid. A carrier of persons "without reward" is subject only to a duty to "use ordinary care and diligence for their safe carriage." (§ 2096.) But a carrier of persons for reward, as was true at common law, is subject to a heightened duty. Section 2100, upon which plaintiffs rely in the present case, states: "A carrier of persons for reward must use the utmost care and diligence for their safe carriage, must provide everything necessary for that purpose, and must exercise to that end a reasonable degree of skill." "Common carriers are not, however, insurers of their passengers' safety. Rather, the degree of care and diligence which they must exercise is only such as can reasonably be exercised consistent with the character and mode of conveyance adopted and the practical operation of the business of the carrier. [Citations.]" (*Lopez v. Southern Cal. Rapid Transit Dist.* (1985) 40 Cal.3d 780, 785 [221 Cal.Rptr. 840, 710 P.2d 907].)[3]

---

[2] Further statutory references are to the Civil Code, unless otherwise indicated.

[3] *Webster v. Ebright* (1992) 3 Cal.App.4th 784 [4 Cal.Rptr.2d 714] held that section 2100 applies only to common carriers, and not to private carriers for reward. We stated in *Lopez v. Southern Cal. Rapid Transit Dist., supra,* 40 Cal.3d 780, 785, that "[t]he duty imposed by section 2100 applies to public carriers as well as private carriers . . . ." We need not resolve the point in the present case, because the parties do not dispute that Disney, if it is a carrier of persons for reward at all, is a common carrier rather than a private carrier. (§ 2168 ["Every one who offers to the public to carry persons . . . is a common carrier . . . ."].)

Section 2101, upon which plaintiffs also rely, further imposes a duty to provide safe vehicles: "A carrier of persons for reward is bound to provide vehicles safe and fit for the purpose to which they are put, and is not excused for default in this respect by any degree of care."

While the rules governing carriage of persons for hire found their first expression in California in cases involving passengers in stagecoaches (*Boyce v. California Stage Co.* (1864) 25 Cal. 460, 468; *Fairchild v. The California Stage Company, supra,* 13 Cal. 599, 605), it soon became apparent that the term "carrier of persons" would be given an expansive definition. In *Treadwell v. Whittier* (1889) 80 Cal. 574, 576 [22 P. 266], a hydraulic elevator in the defendants' store fell and injured the plaintiff. The court had no difficulty concluding that the operators of the elevator qualified as carriers of persons for reward: "The defendants used their elevator in lifting persons vertically to the height of forty feet. That they were carriers of passengers, and should be treated as such, we have no doubt. The same responsibilities as to care and diligence rested on them as on the carriers of passengers by stage-coach or railway." (*Id.* at p. 585.)

As the court in *Treadwell* elaborated: "Persons who are lifted by elevators are subjected to great risks to life and limb. They are hoisted vertically, and are unable, in case of the breaking of the machinery, to help themselves. The person running such elevator must be held to undertake to raise such persons safely, as far as human care and foresight will go. The law holds him to the utmost care and diligence of very cautious persons, and responsible for the slightest neglect. [¶] Such responsibility attaches to all persons engaged in employments where human beings submit their bodies to their control by which their lives or limbs are put at hazard, or where such employment is attended with danger to life or limb. The utmost care and diligence must be used by persons engaged in such employments to avoid injury to those they carry." (*Treadwell v. Whittier, supra,* 80 Cal. 574, 591.) It now is well established that commercial operators of elevators and escalators are carriers of persons for reward. (*Vandagriff v. J.C. Penney Co.* (1964) 228 Cal.App.2d 579, 582 [39 Cal.Rptr. 671]; 6 Witkin, Summary of Cal. Law (9th ed. 1988) Torts, § 768, p. 107.)

The expansive definition of carriers of persons for reward was continued in *Smith v. O'Donnell* (1932) 215 Cal. 714 [12 P.2d 933], which held that an airplane pilot who offered sightseeing flights to the ocean and back was a carrier of passengers for reward despite the circumstance that the flights took off and landed at the same airport. The court noted that the pilot " 'was not engaged in carrying passengers from one terminal, i.e., from the Long Beach

Municipal Airport to another fixed landing field, but rather of carrying "Two passengers for five dollars. . . . Up and down the road toward the ocean." In other words, he was engaged "in the aviation business" for the purpose of taking those who might apply on a flight from the municipal field toward the ocean and back again, landing on the field whence he started.' " (*Id.* at p. 716.)

The court in *O'Donnell* acknowledged the broad scope that had been given to the term carriers of persons for reward, noting that " 'any of the following may be common carriers, viz., stage coaches, busses, automobiles, hackney coaches, cabs, drays, carts, wagons, sleds, elevators and in fact almost every vehicle which can be employed for the purpose.' " (*Smith v. O'Donnell, supra,* 215 Cal. 714, 719.) This court cited with approval the " 'interesting and instructive' " decision in *O'Callaghan v. Dellwood Park Co.* (1909) 242 Ill. 336 [89 N.E. 1005], which held that a "scenic railway" was a common carrier, stating: " ' "Why is not this rule (the rule of liability applying to common carriers) applicable to those operating cars upon a scenic railway such as the one here in question? The passengers carried therein are subject to great risk to life and limb. The steep inclines, sharp curves, and great speed necessarily are sources of peril." ' " (*Smith v. O'Donnell, supra,* 215 Cal. 719.) We noted that the court in *O'Callaghan* rejected the argument that the purpose for which the passenger purchases the ride should make a difference: " 'Should the motive which causes a person to take passage make any difference as to the degree of responsibility with which the carrier is charged? Passenger elevators are frequently operated in buildings in order to convey persons to some vantage point where they can overlook a great city, or some other object of interest, and trips on electric cars are often made solely for pleasure. . . . We think not only by fair analogy, but, on reason and sound public policy, appellant should be held to the same degree of responsibility in the management of the railway in question as a common carrier.' " (*Ibid.*)

There is an unbroken line of authority in California classifying recreational rides as common carriers, including *McIntyre v. Smoke Tree Ranch Stables* (1962) 205 Cal.App.2d 489 [23 Cal.Rptr. 339], which held that the operator of a mule train that took passengers from Palm Springs to Tahquitz Falls and back was a common carrier. The Court of Appeal concluded: "The only reasonable conclusion to be drawn from these facts is that a person who paid a roundtrip fare for the purpose of being conducted by mule over the designated route between fixed termini, purchased a ride; that the defendant offered to carry such a person by mule along that route between these termini; and that the transaction between them constituted an agreement of carriage." (*Id.* at p. 492; see *Squaw Valley Ski Corp. v. Superior Court* (1992) 2 Cal.App.4th 1499 [3 Cal.Rptr.2d 897] [ski resort chair lift facility is a common carrier].)

The first California case to address whether the operator of a roller coaster was a carrier of persons for reward was *Barr v. Venice Giant Dipper Co., Ltd.* (1934) 138 Cal.App. 563, 563–564 [32 P.2d 980], which described the ride upon which the plaintiff was injured as a "roller coaster" that was "in the nature of a miniature scenic railway consisting of a train of small cars constructed to carry two passengers each." The Court of Appeal held that the operator of the ride was a common carrier and, therefore, the trial court properly had instructed the jury under section 2100. The appellate court relied upon "the general and accepted rule which is thus stated in 10 C. J. 609: 'The owner and operator of a scenic railway in an amusement park is subject, where he has accepted passengers on such railway for hire, to the liabilities of a carrier of passengers generally.' " (*Barr v. Venice Giant Dipper Co., Ltd.*, *supra*, 138 Cal.App. at p. 564.)

In *Kohl v. Disneyland, Inc.* (1962) 201 Cal.App.2d 780 [20 Cal.Rptr. 367], the Court of Appeal held that the operators of a stagecoach ride at Disneyland were common carriers. The plaintiffs were riding on The Surrey with the Fringe on Top ride, which was a horse-drawn stagecoach, when the horses became frightened and ran, causing the coach to tip over. The Court of Appeal held that "because of the passenger-carrier relationship between the parties, the duty imposed upon the defendant was to exercise the utmost care and diligence . . . ." (*Id.* at p. 784.)

A federal district court in California echoed the result in *Kohl*, holding that the operators of the Pirates of the Caribbean amusement ride at Disneyland were common carriers. (*Neubauer v. Disneyland, Inc.* (C.D.Cal. 1995) 875 F.Supp. 672.) The plaintiffs in *Neubauer* were injured when the boat in which they were riding was struck from behind by another boat. The federal district court held: "Under plaintiffs' allegations, Disneyland's amusement park boat ride falls within California's broad statutory definition of a common carrier. At the 'Pirates of the Caribbean,' defendant offered to the public to carry patrons. Under these allegations, the duty of utmost care and diligence would apply to Disneyland." (*Id.* at p. 674.)

Although California law has consistently defined broadly the term "carrier of persons for reward" (§§ 2100, 2101), and included within that definition amusement park rides like roller coasters, and other recreational forms of carriage, the same has not always been true in other jurisdictions.

Many of the decisions from other jurisdictions that hold that operators of amusement park rides are not common carriers follow the reasoning in *Harlan v. Six Flags Over Georgia, Inc.* (1982) 250 Ga. 352 [297 S.E.2d 468]. *Harlan* involved an amusement park ride called The Wheelie that

consisted of cars mounted on the sprockets of a wheel that rotated its passengers at increasing speed, eventually suspending them upside down by the power of centrifugal force. Harlan relied upon a Georgia statute that imposed a duty to exercise extraordinary care to protect passengers "who travel in some public conveyance." (*Id.* at p. 469.) The court held that the ride was not a "public conveyance" within the meaning of the statute because passengers board rides and modes of transportation such as elevators with "dissimilar expectations": "Persons using ordinary transportation devices, such as elevators and buses, normally expect to be carried safely, securely, and without incident to their destination. Amusement ride passengers intend to be conveyed thrillingly to a place at, or near to, the point they originally boarded, so that carriage is incidental." (*Ibid.*)

Several cases have adopted the reasoning in *Harlan*. *Lamb v. B & B Amusements Corp.* (Utah 1993) 869 P.2d 926 held that a children's roller coaster is not a common carrier. The court noted that common carriers are held to a high standard of care because "[p]assengers entrust common carriers with their personal safety, have little if any opportunity to protect themselves from harm caused by a common carrier, and pay the carrier for safe transportation. In addition, the public has an important stake in having the public transportation of persons be as safe as possible." (*Id.* at p. 930.) The court acknowledged that operators of amusement park rides similarly "are entrusted with passengers who depend on the operators for their safety," but relied nonetheless on the reasoning in *Harlan* and concluded that "[a]musement rides are not designed to provide comfortable, uneventful transportation, even when the equipment operates without incident and as intended." (*Id.* at p. 931; see *Speed Boat Leasing, Inc. v. Elmer* (Tex. 2003) 124 S.W.3d 210, 213 [47 Tex. Sup. Ct. J. 182] [speedboat offering "thrill" rides in the Gulf of Mexico not a common carrier because "its primary purpose is to entertain, not to transport from place to place"].)

*Firszt v. Capitol Park Realty Co.* (1923) 98 Conn. 627 [120 A. 300, 303–304], held that an amusement park ride called an "aeroplane swing," which consisted of cars made to resemble airplanes that were suspended by steel cables from a rotating tower, was not a carrier. The court recognized that there was justification for applying the rules applicable to common carriers because "the revolving cars or boats are quite similar to the moving trains upon a railroad in the motive power employed and in the considerable hazard of operation of each . . . ." (*Id.* at p. 303.) Nevertheless, the court concluded the rules governing common carriers did not apply because the patron of an amusement park ride is seeking entertainment, not transportation: "One traveling upon his lawful occasions must perforce use the ordinary means of transportation, and is practically compelled to place himself in the care of carriers of passengers, and so the rule applied to carriers holds them to the highest degree of care and diligence. On the other hand, one desiring for his

delectation to make use of pleasure-giving devices similar to the one in question is under no impulsion of business or personal necessity. He is seeking entertainment, and when invited by a manager to avail himself of the equipment provided by certain forms of amusement, he can properly ask only that he be not exposed by the carelessness of those in charge of any given instrumentality to harm preventable by care appropriate to the operation of such instrumentality." (*Id.* at pp. 303–304; see *Sergermeister v. Recreation Corp. of America* (Fla. 1975) 314 So.2d 626, 632.)

In *Bregel v. Busch Entertainment Corp.* (1994) 248 Va. 175 [444 S.E.2d 718], the Virginia Supreme Court concluded without citation to authority that the Skyride—a monocable system that transported patrons in gondolas to three different locations within the Busch Gardens amusement park—was not a common carrier because the ride "is for entertainment purposes, and the transportation function is incidental to the entertainment function." (*Id.* at p. 719.) Similarly, *Wright v. Midwest Old Settlers and Threshers Assoc.* (Iowa 1996) 556 N.W.2d 808, held that a nonprofit association that ran a five-day public event was not a common carrier by virtue of operating a "train" consisting of two cars pulled by a tractor that sold rides around the grounds. The court reasoned: "[T]he association's event is limited in scope and duration to only a few days each year. . . . The purpose of this train is not only to provide transportation around the grounds, but also to entertain the public." (*Id.* at p. 811; see *Gunther v. Smith* (1989) 78 Md.App. 508 [553 A.2d 1314, 1316] [operator of a horse-drawn hayride at a private company picnic was not a common carrier].)

As noted above, in 1932 this court rejected the view later espoused in *Harlan* and its progeny that whether a form of transportation constitutes carriage of persons for reward depends upon the purpose of the transportation. We held instead in *Smith v. O'Donnell, supra,* 215 Cal. 714, that the operator of a sightseeing airplane was a carrier of persons for reward. We found persuasive the contrary reasoning in *O'Callaghan v. Dellwood Park Co., supra,* 242 Ill. 336, that a passenger's motive for seeking transportation was irrelevant in determining the carrier's liability and that the carrier owed the same high duty of care whether the passenger rode for pleasure or business.[4]

---

[4] Some cases that hold that operators of amusement park rides are not common carriers rely upon statutory provisions that differ from those in California. In *Eliason v. United Amusement Co.* (Or. 1972) 264 Ore. 114 [504 P.2d 94, 96], the court relied on an Oregon statute that provided that the operator of an amusement park ride, including a roller coaster, "shall be deemed not a common carrier; however, such owner or operator shall exercise the highest degree of care for the safety of persons using the devices compatible with the practical operation of the devices being used."

We continue to adhere to the view we adopted in *Smith v. O'Donnell, supra,* 215 Cal. 714. As the cases cited above make clear, our conclusion that the operator of a roller coaster or similar amusement park ride can be a carrier of persons for reward is consistent with the authority holding that operators of ski lifts are common carriers, despite the fact that the skiers who ride such lifts are engaged in recreation. (*Squaw Valley Ski Corp. v. Superior Court, supra,* 2 Cal.App.4th 1499.) A passenger's purpose in purchasing transportation, whether it be to get from one place to another or to travel simply for pleasure or sightseeing, does not determine whether the provider of the transportation is a carrier for reward. The passenger's purpose does not affect the duty of the carrier to exercise the highest degree of care for the safety of the passenger.

Certainly there is no justification for imposing a lesser duty of care on the operators of roller coasters simply because the primary purpose of the transportation provided is entertainment. As one federal court noted, "amusement rides have inherent dangers owing to speed or mechanical complexities. They are operated for profit and are held out to the public to be safe. They are operated in the expectation that thousands of patrons, many of them children, will occupy their seats." (*U.S. Fidelity & Guaranty Co. v. Brian* (5th Cir. 1964) 337 F.2d 881, 883.) Riders of roller coasters and other "thrill" rides seek the illusion of danger while being assured of their actual safety. The rider expects to be surprised and perhaps even frightened, but not hurt. The rule that carriers of passengers are held to the highest degree of care is based on the recognition that " '[t]o his diligence and fidelity are intrusted the lives and safety of large numbers of human beings.' " (*Treadwell v. Whittier, supra,* 80 Cal. 574, 591.) This applies equally to the rider of a roller coaster as it does to the rider of a bus, airplane, or train.[5]

---

[5] We hold only that the operator of a roller coaster or similar amusement park ride can be a carrier of persons for reward under sections 2100 and 2101. We do not address, and express no opinion regarding, whether other, dissimilar, amusement rides or attractions can be carriers of persons for reward.

The dissent and amici curiae in support of Disney assert incorrectly that our decision in *McCordic v. Crawford* (1943) 23 Cal.2d 1 [142 P.2d 7] is controlling. The defendant in *McCordic* leased the Venice Pier and contracted with various concessionaires to operate carnival attractions, including a ride called the Loopa on which the plaintiff was injured. We held that the defendant could be found liable under principles of premises liability if he failed to reasonably supervise the concessionaire who operated the ride, stating: " '[A] proprietor, or one who operates a place of amusement, owes a legal duty to exercise due care to protect from injury individuals who come upon his premises by his express or implied invitation. He must see that such premises are in a reasonably safe condition. It constitutes a breach of this duty for him to fail to exercise reasonably careful supervision of the appliances or methods of operating concessions under his management. The proprietor or operator of such a place of amusement is liable to an invited member of the public for injuries received as the result of negligence on the part of an independent contractor or concessionaire when it is shown that the failure to exercise such supervision proximately results in injuries to a patron.' " (*Id.* at pp. 6–7.) Our decision did

Other jurisdictions agree with the rule adopted in California. The Alabama Supreme Court in *Best Park & Amusement Co. v. Rollins* (1915) 192 Ala. 534 [68 So. 417, 418], followed the decision of the Illinois Supreme Court in *O'Callaghan v. Dellwood Park Co., supra,* 89 N.E. 1005, and held that a "scenic railway" in an amusement park " 'should be held to the same degree of responsibility in the management of the railway in question as a common carrier.' " (See *Bibeau v. Fred W. Pearce Corp.* (1928) 173 Minn. 331 [217 N. W. 374, 376]; *Tennessee State Fair Assn. v. Hartman* (1915) 134 Tenn. 159 [183 S. W. 735, 736]; *Lyons v. Wagers* (1966) 55 Tenn.App. 667 [404 S.W.2d 270, 274].) The Missouri Supreme Court stated without explanation in *Pointer v. Mountain Ry. Const. Co.* (1916) 269 Mo. 104 [189 S.W. 805] that "scenic railways . . . are not common carriers of passengers in any sense of the word," but subsequent decisions in Missouri have departed from that stance. (See *Brown v. Winnwood Amusement Co.* (1931) 225 Mo.App. 1180 [34 S.W.2d 149, 152] [operator of roller coaster held to the degree of care required of common carriers]; *Cooper v. Winnwood Amusement Co.* (1932) 227 Mo.App. 608 [55 S.W.2d 737, 742] [same].)

The Colorado Supreme Court held in *Lewis v. Buckskin Joe's, Inc.* (1964) 156 Colo. 46 [396 P.2d 933], that a stagecoach ride that traveled over a fixed course as a tourist attraction in a replica of a ghost mining town should be held to the highest degree of care regardless of the passenger's purpose in entering the ride: "It is not important whether defendants were serving as a carrier or engaged in activities for amusement. The important facts are, the plaintiffs had surrendered themselves to the care and custody of the defendants; they had given up their freedom of movement and actions; there was noting they could do to cause or prevent the accident. Under the circumstances of this case, the defendants had exclusive possession and control of the facilities used in the conduct of their business and they should be held to the highest degree of care . . . ." (*Id.* at p. 939.)

The Oklahoma Supreme Court held in *Sand Springs Park v. Schrader* (1921) 82 Okla. 244 [1921 OK 207, 198 P. 983, 987–988] that the operators of "a scenic railway or roller-coaster" was "bound to use the highest degree of care and caution for the safety of his patrons," observing: "We are unable to see the force of the contention that one who rides a scenic railway should be held to assume any other or further risks than would a passenger riding a passenger train. The fact that the passenger on a scenic railway might be

---

not address the duty of care of the operator of an amusement park ride or whether the operator of such a ride was a carrier of persons for reward and thus does not apply in the present case.

seeking pleasure and recklessly accepts the risks, it may be stated, would [be no more different than would] a passenger riding a passenger train on a pleasure trip."

Disney points to the fact that section 2085, which defines a contract of carriage for purposes of sections 2100 and 2101, states that a contract of carriage is a "contract for the conveyance of property, persons, or messages, from one place to another." Disney argues that the amusement ride at issue is not included within this definition because it is "confined in a single building" and thus does not transport persons "from one place to another." But the same can be said about elevators and escalators, which long have been held to constitute carriage of persons from one place to another although they are confined in a single building. (*Treadwell v. Whittier*, *supra*, 80 Cal. 574; 6 Witkin, Summary of Cal. Law, *supra*, Torts, § 768, p. 107.) Further, we long ago rejected such a limited interpretation of "from one place to another" by including within the definition of carriage of persons for reward a sightseeing airplane ride that took off and landed at the same airport. (*Smith v. O'Donnell*, *supra*, 215 Cal. 714, 717.) The circumstance that a passenger begins and ends a journey in the same place does not mean he or she has not been transported. A tourist in San Francisco who takes a round-trip ride on a cable car solely for entertainment has been transported and is no less entitled to a safe ride than another passenger on the same cable car who disembarks earlier to visit a store or restaurant.

The dissent disagrees, asserting that "it is clear that the Legislature understood the phrase 'carrier of persons for reward' in sections 2100 and 2101 to refer to those who provide transportation services to passengers traveling from one point to another. [¶] The Indiana Jones ride does not provide such transportation and serves no transportation function." (Dis. opn., *post*, at p. 1144.) The precise contours of the dissent's analysis are difficult to discern.

The dissent reaches the surprising conclusion that "a roller coaster is not designed to provide transportation at all." (Dis. opn., *post*, at p. 1155, fn. 5.) The dissent reasons that the phrase "carrier of persons for reward" in sections 2100 and 2101 only "refer[s] to those who provide transportation services to passengers traveling from one point to another." (Dis. opn., *post*, at p. 1146.) But we know that the distance between these two points (assuming any distance at all is required) need not be great. It is well established that an elevator may be a carrier of persons even though the passenger is transported only from one floor of a building to another. Thus, accepting the dissent's reasoning would mean that a roller coaster that began

on an elevated platform and ended one floor below on ground level would be a carrier of persons, but a roller coaster that began and ended in the same place would not be. The dissent does not explain why the Legislature would want to create such a meaningless distinction.

The essence of the dissent's analysis, therefore, appears to be that a roller coaster "serves no transportation function," because "its function is solely to thrill" its passengers and "[t]he movement along the track is purely incidental to the ride's purpose." (Dis. opn., *post*, at pp. 1144–1145.) As noted above, the view that roller coasters are not carriers of persons because "passengers intend to be conveyed thrillingly . . . so that carriage is incidental" has been accepted as the rule in some other jurisdictions. (*Harlan v. Six Flags Over Georgia, Inc., supra*, 297 S.E.2d 468, 469.) But California considered and rejected this approach more than 70 years ago, holding instead that a passenger's purpose in purchasing transportation does not determine whether the provider of the transportation is a carrier of persons. (*Smith v. O'Donnell, supra*, 215 Cal. 714, 719.)

In a novel twist, the dissent denies relying upon the passenger's purpose, noting in a footnote that its "analysis does not depend on . . . ' "the motive which causes a person to take passage." ' [Citation.]" (Dis. opn., *post*, at p. 1155, fn. 5.) Rather, the dissent argues that a device is a carrier of persons "if the device at issue is fundamentally a means of transportation." (*Ibid.*) But the dissent does not explain how the fundamental nature of a transportation device should be determined. Fundamentally, a roller coaster is intended to transport people along a fixed route in an exciting and fun manner. It is not clear, therefore, why a roller coaster is not fundamentally a means of transportation for the same reason that a helicopter sightseeing ride that begins and ends at the same place is a means of transportation, despite the fact that its primary purpose is to thrill and amuse its passengers.

Our decision in *Golden Gate Scenic Steamship Lines, Inc. v. Public Utilities Commission* (1962) 57 Cal.2d 373 [19 Cal.Rptr. 657, 369 P.2d 257] (*Golden Gate*), does not affect our analysis, because that case addressed the jurisdiction of the Public Utilities Commission rather than the meaning of Civil Code sections 2100 and 2101. Public Utilities Code section 1007 required entities providing "transportation of persons or property, for compensation, between points in this state" to obtain a certificate of public convenience and necessity from the Public Utilities Commission. We held in *Golden Gate* that a boat that carried paying passengers on a sight-seeing tour of San Francisco Bay need not obtain such a certificate because the boats "do not operate between points," noting that the trips began and ended on the

same wharf. (*Golden Gate, supra,* at p. 376.) We based our decision on the language of Public Utilities Code section 1007, explaining that the word "points" as used in that statute means "termini" and it thus follows that "there must be two or more ends-of-the-line, stations, towns, or places between which the vessel operates." (*Golden Gate, supra,* at p. 380.) We added that "[t]he word 'between' in ordinary usage connotes two different points bounding or defining some line or area." (*Ibid.*) Public Utilities Code section 1007 is part of a regulatory regime for transportation, the purpose of which is distinct from the liability standard for carriers of persons for reward, which is set forth in the Civil Code. (See *Squaw Valley Ski Corp. v. Superior Court, supra,* 2 Cal.App.4th 1499, 1513 [operators of ski lifts are common carriers under Civil Code section 2186 despite Public Utilities Code section 212, which exempts ski lifts from the definition of "common carrier" for purposes of regulation by the Public Utilities Commission].) Because the present case does not involve Public Utilities Code section 1007, our decision in *Golden Gate, supra,* 57 Cal.2d 373, does not apply.

The Court of Appeal in *City of St. Helena v. Public Utilities Commission* (2004) 119 Cal.App.4th 793 [14 Cal.Rptr.3d 713] gave an overly expansive reading to our decision in *Golden Gate, supra,* 57 Cal.2d 373, concluding that our "definition of 'transportation' was not confined to section 1007; rather it was in accord with the word's ordinary meaning." (*City of St. Helena v. Public Utilities Commission, supra,* 119 Cal.App.4th at p. 802.) *City of St. Helena* held that the Wine Train, which provided a round trip excursion through the wine country in Napa Valley, was not subject to regulation as a public utility because it "does not qualify as a common carrier providing transportation." (*Id.* at p. 796.) In reaching that conclusion, the Court of Appeal did not discuss or attempt to distinguish our decision in *Smith v. O'Donnell, supra,* 215 Cal. 714, or the Court of Appeal's decision in *McIntyre v. Smoke Tree Ranch Stables, supra,* 205 Cal.App.2d 489. We express no view on whether the Court of Appeal was correct that the Wine Train is not subject to regulation as a public utility, but we disapprove the decision in *City of St. Helena v. Public Utilities Commission, supra,* 119 Cal.App.4th 793, to the extent it suggests that, in general, a provider to the public of roundtrip sight-seeing excursions is not a carrier of persons for reward.

Disney observes that, effective July 12, 2003, the state Office of Administrative Law approved a series of regulations governing the operation of "Permanent Amusement Rides" (Cal. Code Regs., tit. 8, div. 1, ch. 3.2, § 344.5 et seq.) and cites our decision in *Ramirez v. Plough* (1993) 6 Cal.4th 539 [25 Cal.Rptr.2d 97, 863 P.2d 167], to support the argument that we should defer to those regulations. We held in *Ramirez* that a drug manufacturer's compliance with applicable statutes and regulations that required providing warnings to consumers in English only satisfied its duty to warn.

The present case arises from an order sustaining a demurrer. The only issue before us, therefore, is whether plaintiffs can state causes of action under sections 2100 and 2101 governing the liability of carriers of persons for reward. We are not called upon to determine in the present proceedings whether compliance by Disney with the cited regulations, which were approved after the incident at issue here, would satisfy its duty of care. The issue before us is only whether plaintiffs may maintain a cause of action under sections 2100 and 2101. The administrative regulations cited by Disney do not affect that issue.

Disney argues that the term "carrier of persons for reward" as used in sections 2100 and 2101 must be interpreted to exclude operators of amusement park rides because "[t]reating amusement rides as common carriers . . . renders part of the common carrier statutory scheme utterly irrelevant." Disney points to section 2104, which provides that "[a] carrier of persons for reward must travel at a reasonable rate of speed, and without any unreasonable delay, or deviation from his proper route," section 2172, which requires that a common carrier "must start at such time and place as he announces to the public . . . in order to connect with carriers on other lines of travel," and section 2184, which provides that "[a] common carrier of persons must provide a sufficient number of vehicles to accommodate all the passengers who can be reasonably expected to require carriage at any one time."

It is of course true that not all the statutes pertaining to carriers of persons for reward apply to every form of transportation. But it does not follow that any form of transportation to which these statutes do not apply cannot be a common carrier and carrier of persons. It is well established that commercial operators of elevators are carriers of persons for reward, although it would make little sense to require that they travel at a reasonable rate, or not deviate from their proper route, or start at an announced time in order to connect with other forms of travel. The same can be said of operators of ski lifts or those offering sight-seeing rides on airplanes or helicopters.

We conclude, therefore, that the operator of a roller coaster or similar amusement park ride can be a carrier of persons for reward under sections 2100 and 2101. Accordingly, we agree with the Court of Appeal that the superior court should have overruled Disney's demurrer to those counts of the amended complaint raising causes of action under sections 2100 and 2101.

DISPOSITION

The judgment of the Court of Appeal is affirmed.

Kennard, Acting C. J., Werdegar, J., and Vogel, J.,* concurred.

**CHIN, J.,** Dissenting.—I disagree with the majority's holding that the Walt Disney Company (Disney), in operating the Indiana Jones ride at Disneyland, constitutes a "carrier of persons for reward" within the meaning Civil Code sections 2100 and 2101.[1] When the Legislature passed these statutes in 1872, it almost certainly did not intend that they would be applied to the kind of amusement park thrill ride at issue here, and the majority notably does not assert otherwise. Under our rules of statutory interpretation, this should be the controlling factor in deciding the question at issue here.

It is therefore surprising that the majority, in reaching its conclusion, makes no effort to determine the Legislature's intent and fails even to identify this as a relevant consideration. Instead, the majority bases its conclusion solely on the purportedly "expansive definition" of the statutory language (maj. opn., *ante*, at p. 1131) that California courts have adopted in what the majority asserts is "an unbroken line of authority" involving "recreational rides" since the statutes were passed. (*Id.* at p. 1132.) As I demonstrate below, the cases the majority cites do not compel the conclusion the majority reaches in this case. Because the majority's holding is neither consistent with the Legislature's intent nor required by our case law, I dissent.

### I. *Background Facts*

At issue in this demurrer proceeding is the legal sufficiency of the claims alleged under sections 2100 and 2101 in plaintiffs' second amended complaint. That complaint alleges that Cristina Moreno suffered a fatal brain injury as a result of riding "an amusement ride" known as the "Indiana Jones Attraction" at "the Disneyland Amusement Park," which is owned and operated by Disney. According to the complaint, this attraction "consists of a dynamic ride vehicle which is used to enhance the sensation of vehicle motion and travel experience by passengers in the vehicle, while it is being used in an amusement park environment. The vehicle is used to transport passengers while, at the same time, providing them with entertainment and thrills." It "is configured to resemble an off-road jeep," and "is moved along a predetermined path on a track." The ride is "fast" and "turbulent, combining

---

*Associate Justice, Court of Appeal, Second Appellate District, Division One, assigned by the Acting Chief Justice pursuant to article VI, section 6, of the California Constitution.

[1] All further statutory references are to the Civil Code.

the ups and downs of a roller coaster with jarring jumps, drops, and unpredictable movements" that "shake[] and whipsaw[] riders with [great] fury." The complaint alleges that the ride's "sudden changes in direction" caused "bleeding in the brain" that ultimately resulted in Ms. Moreno's death.

II. *The Legislature Did Not Intend to Treat the Operator of an Amusement Park Thrill Ride as a "Carrier of Persons" Under the Statutes*

At issue here is the proper construction of sections 2100 and 2101. Thus, "[a]s in any case involving statutory interpretation, our fundamental task here is to determine the Legislature's intent so as to effectuate the law's purpose. [Citation.]" (*People v. Murphy* (2001) 25 Cal.4th 136, 142 [105 Cal.Rptr.2d 387, 19 P.3d 1129] (*Murphy*).) Of course, over the years, we have adopted a number of rules to aid us in determining the Legislature's intent regarding a statute. Notably, in its analysis, the majority ignores both our task—to determine *the Legislature's* intent—and the relevant rules of statutory construction for performing it. Applying those rules, I conclude that the Legislature did not intend to treat the operator of an amusement park thrill ride like the one at issue here as a "carrier of persons for reward" within the meaning of sections 2100 and 2101.

The first rule of statutory construction requires us "to determine the Legislature's intent when it enacted the statute" in question. (*City of Burbank v. State Water Resources Control Bd.* (2005) 35 Cal.4th 613, 625 [26 Cal.Rptr.3d 304, 108 P.3d 862]; see also *Peralta Community College Dist. v. Fair Employment & Housing Com.* (1990) 52 Cal.3d 40, 52 [276 Cal.Rptr. 114, 801 P.2d 357] [our task is to determine the "intent of the Legislature that enacted the law"].) Because the intent of the enacting Legislature controls, we must interpret the words of the statutes "in the sense in which they would have been understood at the time of the enactment. [Citations.]" (*People v. Cruz* (1996) 13 Cal.4th 764, 775 [55 Cal.Rptr.2d 117, 919 P.2d 731].) Here, because sections 2100 and 2101 were enacted in 1872 and have never been amended, "the intention of the legislature at [that] time . . . control[s]" our construction of the phrase "carrier of persons for reward" in those sections. (*Walther v. Southern Pacific Co.* (1911) 159 Cal. 769, 775 [116 P. 51].) Thus, we must interpret that phrase in the sense it was understood in 1872, i.e., "in light of its historical background and evident objective. [Citations.]" (*United Business Com. v. City of San Diego* (1979) 91 Cal.App.3d 156, 170 [154 Cal.Rptr. 263].)

In determining the intent and understanding of the 1872 Legislature, we give substantial weight to the comments of the California Code Commission (Commission), which proposed the 1872 Civil Code. (See *Li v. Yellow Cab*

*Co.* (1975) 13 Cal.3d 804, 817 [119 Cal.Rptr. 858, 532 P.2d 1226] ["true meaning and intent" of Civil Code section "cannot proceed without reference to the Code Commissioners' Note"]; see also *Van Arsdale v. Hollinger* (1968) 68 Cal.2d 245, 249 [66 Cal.Rptr. 20, 437 P.2d 508] ["Reports of commissions which have proposed statutes that are subsequently adopted are entitled to substantial weight"].) The notes to sections 2100 and 2101 consist primarily of quotations and citations of cases. All of the cited cases involve passengers using either railroads or horse-drawn coaches and stages to travel from one point to another. (Code commrs., notes foll. Ann. Civ. Code, §§ 2100, 2101 (1st ed. 1874, Haymond & Burch, commrs.-annotators) p. 7.) The principal case discussed in the note to section 2100 involved a stagecoach, and it required the court to determine the standard of liability for "carriers of passengers for hire." (*Ingalls v. Bills* (1845) 50 Mass. 1, 15 [9 Metc. 1].) In that case, the court explained that this issue was of "much importance" to those "engaged in business which requires their transportation from place to place in vehicles furnished by others . . . ." (*Id.* at p. 6.)

Also relevant here is the note to section 2168, which provides that "[e]very one who offers to the public to carry persons, property, or messages, excepting only telegraphic messages, is a common carrier of whatever he thus offers to carry." One portion of that note is entitled, "Who are Treated as Common Carriers by the Courts of California," and it lists the following: "Stage Coaches," "Steamboats," "Steamtugs," "Railroads," and "Ferryman." (Code commrs., notes foll. Ann. Civ. Code, § 2168, *supra*, pp. 27–28.) Elsewhere, the note summarizes a prominent treatise on bailments, which listed the following as "Common carriers . . . : 1. Proprietors of stage coaches, and stage wagons, and railroad cars, which ply between different places and carry goods for hire . . . , so are truckers, wagoners, teamsters, cartmen, and porters, who undertake to carry goods for hire, as a common employment, from one town to another . . . , or from one part of a town or city to another . . . . 2. Owners and masters of ships, steamboats, lightermen, hoymen, barge owners, ferrymen, canal boatmen, and others employed in like manner." (*Id.,* p. 26.) The note also quotes a Massachusetts decision that "defined a common carrier to be 'one who undertakes, for hire, to transport the goods of such as choose to employ him from place to place.' " (*Ibid.*) Based on these notes, it is clear that the Legislature understood the phrase "carrier of persons for reward" in sections 2100 and 2101 to refer to those who provide transportation services to passengers traveling from one point to another.

The Indiana Jones ride does not provide such transportation and serves no transportation function. By design, its function is solely to thrill park patrons through excessive speed and, as alleged in the complaint, "jarring jumps, drops, and unpredictable movements." It is chosen by amusement park

patrons specifically because of these features. The movement along the track is purely incidental to the ride's purpose. In these respects, the Indiana Jones ride bears no resemblance to the modes of transportation mentioned in the Commission's notes. It simply is not what the Legislature had in mind as a "carrier of persons for reward." (§§ 2100, 2101.)

This conclusion is consistent with the broader historical background and context. The Commission's notes to sections 2100, 2101, and 2168 liberally cited to two 19th Century treatises: an 1849 treatise by Joseph Angell, entitled A Treatise on the Law of Carriers of Goods and Passengers by Land and by Water (hereafter Angell on Carriers), and an 1869 treatise by Isaac Redfield, entitled The Law of Carriers of Goods and Passengers (hereafter Redfield on Carriers). (Code commrs., notes foll. Ann. Civ. Code, §§ 2100, 2101, 2168, *supra*, at pp. 7, 25–27.) The preface to Angell on Carriers noted the increased importance of this subject to "the mercantile and travelling public" given the use of steam in "the transportation of commodities and of travellers" and the advent of the railroad, an "expeditious, commodious, and now common means of commercial transportation, and mercable and social intercourse by land." (Angell on Carriers, *supra*, at pp. iii–iv.) The treatise later explained that "the first and most general obligation on the part of common carriers of passengers . . . is to carry persons who apply for transportation." (*Id.* at p. 490.) The introduction to Redfield on Carriers similarly explained that the treatise was prompted by the "vast amount of the business of the country transacted by means of railways, express companies, and telegraphs." (Redfield on Carriers, *supra*, at p. 2.) The treatise later explained that the term "common carrier . . . embraces the proprietors of stage-wagons and coaches, omnibuses and railways . . . and all who engage regularly in the transportation of goods or money, either from town to town, or from place to place in the same town." (*Id.* at p. 16.) Another treatise from the era similarly explained that a "carrier" is an "agent of commerce" involved in "[t]he internal and external carrying trade of a highly commercial people." (Edwards, A Treatise on the Law of Bailments (1855) p. 424.) Another 19th century treatise dealing only with carriers of passengers defined a "Public Carrier[] of Passengers" as "[o]ne who for hire, undertakes the transportation of persons from place to place, as a business . . . ." (Ray, Negligence of Imposed Duties, Carriers of Passengers (1893) p. 1.)

Similar themes appear in legal dictionaries published at the time the Legislature passed the 1872 statutes in question. An 1871 dictionary defined a "carrier" as "[o]ne who carries or agrees to carry the goods of another, from one place to another, for hire, or without hire." (Burrill, A Law Dict. & Glossary (1871) p. 252.) It explained that "[c]ommon carriers are of two kinds; by *land*, as owners of stages, stage-wagons, rail-road cars, teamsters, cartmen, draymen and porters; and by *water*, as owners of ships, steamboats,

barges, ferrymen, lightermen, and canal boatmen." (*Id.* at p. 323.) Similarly, an 1872 dictionary defined a "carrier" as "[o]ne who undertakes to transport goods from one place to another." (1 Bouvier, Law Dict. (1872) p. 242.) It also explained that the term "common carrier[]" includes "stagecoach proprietors, railway-companies, truckmen, wagoners and teamsters, carmen and porters, and express companies, whether such persons undertake to carry goods from one portion of the same town to another, or through the whole extent of the country, or even from one state or kingdom to another." (*Id.* at p. 299.) It included the following definition of the term "passenger": "One who has taken a place in a public conveyance for the purpose of being transported from one place to another. One who is so conveyed from one place to another." (*Id.* at p. 297.) Like the Commission's notes, these historical sources support the conclusion that the Legislature understood the phrase "carrier of persons for reward" in sections 2100 and 2101 to refer to those who provide transportation services to passengers traveling from one point to another. As already explained, Disney, in operating the Indiana Jones ride, does not fall into this category.

The next relevant rule of statutory construction directs that in construing a statute, we do not "consider the statutory language 'in isolation.' [Citation.] Rather, we look to 'the entire substance of the statute . . . in order to determine the scope and purpose of the provision . . . . [Citation.]' [Citation.] That is, we construe the words in question ' "in context, keeping in mind the nature and obvious purpose of the statute . . . ." [Citation.]' [Citation.] We must harmonize 'the various parts of a statutory enactment . . . by considering the particular clause or section in the context of the statutory framework as a whole.' [Citations.]" (*Murphy, supra,* 25 Cal.4th at p. 142.)

The relevant statutory context further indicates that the Legislature did not intend to include an operator of an amusement park ride like the one at issue here as a "carrier of persons for reward" within the meaning of sections 2100 and 2101. These sections were enacted as part of a title of the Civil Code entitled Carriage. The first section of the title generally defined a "contract of carriage" as "a contract for the conveyance of property, persons, or messages, *from one place to another.*" (§ 2085, italics added.) The title imposed a number of requirements on carriers. Among other things, it required "[a] carrier of persons for reward [to] give to passengers all such accommodations as are usual and reasonable . . . and [to] give them a reasonable degree of attention." (§ 2103.) It also required "[a] carrier of persons for reward [to] travel at a reasonable rate of speed, and without any unreasonable delay, or deviation from his proper route." (§ 2104.) It required "[a] common carrier . . . always [to] give a preference in time . . . to the United States and to this State." (§ 2171.) It required "[a] common carrier of persons [to] provide a sufficient number of vehicles to accommodate all the passengers who can be

reasonably expected to require carriage at any one time" (§ 2184) and to "provide every passenger with a seat." (§ 2185.) These provisions, which still exist today in substantially the same form, are all readily applicable to those who provide transportation services to passengers traveling from place to place. By contrast, as the majority concedes (maj. opn., *ante*, at p. 1140), these provisions are not logically applicable to either amusement park rides in general or the Indiana Jones ride in particular. Thus, like the Commission's notes and the historical sources, the relevant statutory context indicates that the Legislature did not intend the term "carrier of persons for reward" in sections 2100 and 2101 to include the operator of an amusement park thrill ride like the one at issue here.

Another relevant rule of statutory construction directs us to give statutory language "a commonsense meaning. [Citations.]" (*People v. Nguyen* (2000) 22 Cal.4th 872, 878 [95 Cal.Rptr.2d 178, 997 P.2d 493].) In general, "[s]tatutes are to be given a reasonable and commonsense interpretation consistent with the apparent legislative purpose and intent 'and which, when applied, will result in wise policy rather than mischief or absurdity.' [Citation.]" (*Dyna-Med, Inc. v. Fair Employment & Housing Com.* (1987) 43 Cal.3d 1379, 1392 [241 Cal.Rptr. 67, 743 P.2d 1323].) We follow this rule because "[i]n attempting to ascertain legislative intent when construing a statute we presume that the Legislature did not intent absurd results. [Citation.]" (*In re Head* (1986) 42 Cal.3d 223, 232 [228 Cal.Rptr. 184, 721 P.2d 65].)

The majority's conclusion that the Indiana Jones ride is a "carrier of persons for reward" within the meaning of sections 2100 and 2101 violates this rule. To begin with, the majority's conclusion defies common sense. As three members of the Missouri Supreme Court observed almost 90 years ago: "We, as a court, are not more ignorant than the general public. What is generally known, we must know. We know that there are a great number of pleasure devices, the objects and purposes of which are to furnish sensational experiences for pleasure seekers. The scenic railways with all their variations; the circular swings with all their variations; toboggan slides, etc. They are not common carriers of passengers in any sense of the word." (*Pointer v. Mountain Ry. Const. Co.* (1916) 269 Mo. 104 [189 S.W. 805, 813] (lead opn. on this point by Graves, J.).) The majority's conclusion also will result in mischief and absurdity; it opens the door to lawsuits attempting to force amusement park operators to comply with all of the statutes that apply to common carriers of persons for reward. For example, we can now expect to see someone who had to wait in line for a ride on the Indiana Jones attraction suing Disney for failing to "provide a sufficient number of vehicles to accommodate all the passengers who can be reasonably expected to require carriage at any one time." (§ 2184.) The majority suggests that this requirement does not apply to the Indiana Jones ride (maj. opn., *ante*, at p. 1140),

but it offers no analysis or principled basis for why this is so. Moreover, although the majority purports to address only "roller coaster[s]" and "similar amusement park ride[s]," it offers no basis for not applying its holding to "other, dissimilar, amusement rides." (Maj. opn., *ante,* at p. 1136, fn. 5.) Thus, under the majority's holding, we can expect to see the statutory requirements applicable to common carriers of persons for reward imposed on operators of merry-go-rounds and other such rides. Even the operator of a mechanical bull would appear to be a carrier of persons for reward under the majority's holding, inasmuch as this device physically moves the rider up and down, and side to side. That the majority's construction produces such mischievous and absurd results and fails to give the statutory language a commonsense meaning are additional reasons for concluding that it does not correctly reflect the Legislature's intent. And because the majority's construction does not correctly reflect the 1872 Legislature's intent, we should not adopt it.

Finally, the majority's holding ignores another relevant rule of statutory interpretation: "[i]n attempting to ascertain [the Legislature's] intent," we should consider the "consequences that will flow from a particular interpretation." (*In re Ryan's Estate* (1943) 21 Cal.2d 498, 513 [133 P.2d 626].) Under the majority's holding, the operator of an amusement park thrill ride like the one at issue here will be liable for injury unless it "use[d] the utmost care and diligence." (§ 2100.) We have interpreted this standard to "require[] . . . all that human care, vigilance, and foresight reasonably can do under the circumstances. [Citation.]" (*Lopez v. Southern Cal. Rapid Transit Dist.* (1985) 40 Cal.3d 780, 785 [221 Cal.Rptr. 840, 710 P.2d 907].) Applying this standard to conventional transportation devices is completely consistent with the purpose and design of such devices: to provide smooth, secure and uneventful transportation. Such devices are designed, as much as possible, to eliminate danger. However, applying the same rule to amusement park thrill rides is inconsistent with the fundamental purpose and nature of such rides, which is, in the majority's words, to "frighten[]" and "surprise[]" riders using means that present " 'inherent dangers.' " (Maj. opn., *ante,* at p. 1136.) In other words, dangerous elements are intentionally incorporated into such rides, and patrons choose such rides precisely for this reason. Of course, in order to accomplish their purpose, thrill rides need not be configured in any particular way; each such ride can be less long, less high, less fast, or less bumpy. Thus, it is likely that most such rides will fail the utmost-care test, and despite the majority's assurance that " '[c]ommon carriers are not . . . insurers of their passengers' safety' " (maj. opn., *ante,* at p. 1130), operators of amusement park thrill rides effectively will be under the majority's holding. As a result, the majority's holding poses the very real threat of eliminating such rides. At the very least, it surely will "alter the nature of the activity." (*Kahn v. East Side Union High School Dist.* (2003) 31 Cal.4th 990,

1003 [4 Cal.Rptr.3d 103, 75 P.3d 30].) Absent clearer language in a statute addressing the subject, I would leave this policy decision to the Legislature.

On the other hand, my conclusion does not create any kind of special liability exemption for the amusement park industry. To the contrary, as applied to amusement park thrill rides, our ordinary negligence law imposes exacting requirements on operators of such rides. Under that law, what constitutes "ordinary care" varies "in proportion to the danger to be avoided and the consequences that might reasonably be anticipated [citations]." (*Warner v. Santa Catalina Island Co.* (1955) 44 Cal.2d 310, 317 [282 P.2d 12].) In other words " 'in the exercise of ordinary care, . . . the amount of caution required by the law increases, as does the danger that should reasonably be apprehended.' " (*Jensen v. Minard* (1955) 44 Cal.2d 325, 328 [282 P.2d 7].) Thus, although the majority is rightly concerned about the " 'inherent dangers' " of thrill rides (maj. opn., *ante*, at p. 1136), ordinary negligence law already accommodates that concern. Under that law, it would be " 'entirely proper and feasible for the trial court, in elucidating the standard of ordinary care to the jury, by proper comment upon the evidence to . . . suggest[] that the operating hazard of [the Indiana Jones ride] was considerable, and that ordinary care required more, and more exact, supervision in its use than obtains in the case where there is little or no element of danger involved in any given device.' [Citation.]" (*Sergermeister v. Recreation Corp. of America* (Fla. 1975) 314 So.2d 626, 632 [holding that amusement park ride operator is not a common carrier].) Thus, it is unnecessary to contort our common carrier law to address the majority's concern.

### III. *California Case Law Does Not Compel the Majority's Conclusion*

As initially noted, although our duty in this case is to determine the Legislature's intent regarding sections 2100 and 2101, the majority fails even to identify this as a relevant question. Instead, the majority bases its conclusion solely on existing case law. However, California case law does not compel the conclusion the majority reaches here.

At the outset, the majority's analysis ignores a fundamental principle set forth in this court's prior decisions: Because " 'the law applicable to common carriers is peculiarly rigorous, . . . it ought not to be extended to persons who have not expressly assumed that character, or by their conduct and from the nature of their business justified the belief on the part of the public that they intended to assume it.' [Citation.]" (*People v. Duntley* (1932) 217 Cal. 150, 164 [17 P.2d 715]; see also *Samuelson v. PUC* (1951) 36 Cal.2d 722, 730 [227 P.2d 256].) Clearly, with respect to its operation of the Indiana Jones ride, Disney did not expressly assume the character of a common carrier. Nor did Disney's conduct or the nature of its business justify a belief that Disney

intended to assume such a character. Thus, the majority's extension of our common carrier statutes to Disney in this case is contrary to our case law.

The next flaw in the majority's analysis is that it proceeds as if we have never considered the liability of operators and proprietors of places of amusement, when in fact we did so in *McCordic v. Crawford* (1943) 23 Cal.2d 1 [142 P.2d 7] (*McCordic*). There, after being injured on an amusement ride called the "Loopa," the plaintiff obtained a judgment against the proprietor of the amusement park and the concessionaire who was operating the ride. (*Id.* at pp. 3–4.) In affirming the judgment, we explained: "The law is well settled . . . 'that a proprietor, or one who operates a place of amusement, owes a legal duty to exercise due care to protect from injury individuals who come upon his premises by his express or implied invitation. He must see that such premises are in a reasonably safe condition. It constitutes a breach of this duty for him to fail to exercise reasonably careful supervision of the appliances or methods of operating concessions under his management.' " (*Id.* at pp. 6–7.)[2] Thus, in determining the proprietor's liability, we applied the ordinary negligence standard of care, not the heightened standard of care that applies to a "carrier of persons for reward" under section 2100.

As we explained in *McCordic*, our decision there was simply an application of "well settled" law regarding the liability of operators and proprietors of places of amusement. (*McCordic, supra,* 23 Cal.2d at p. 6.) Among the decisions we cited in support of this well-settled law was the Pennsylvania Supreme Court's decision in *Engstrom v. Huntley* (1942) 345 Pa. 10 [26 A.2d 461]. (*McCordic, supra,* 23 Cal.2d at p. 7.) There, with regard to riders of an amusement park ride called the "Tilt-a-Whirl," the court held that the owner and operator of the amusement park "was required to exercise the measure of care owing to invitees," i.e., " 'reasonable care in the construction, maintenance and management of' " the ride. (*Engstrom, supra,* 26 A.2d at p. 463.) Notably, in *Davidson v. Long Beach Pleasure Pier Co.* (1950) 99 Cal.App.2d 384 [221 P.2d 1005], a California appellate court later applied the same standard of care in a case also involving the Tilt-a-Whirl. Citing *Engstrom,* the *Davidson* court stated: "The proprietor of a public place of amusement is required to maintain in a reasonably safe condition, every contrivance used in its premises, and to properly inspect and supervise the same. [Citations.] . . . [¶] In addition to the duties of maintenance, inspection, and supervision, with which the operator was likewise charged, it was his further duty to use reasonable care to see that the girls were not injured while the tilt-a-whirl was running. [Citation.]" (*Davidson, supra,* 99 Cal.App.2d at

---

[2] Given this statement, the majority is incorrect in asserting that *McCordic* "did not address the duty of care of the operator of an amusement park ride." (Maj. opn., *ante,* at pp. 1136–1137, fn. 5.)

p. 387.) In support of its conclusion, the *Davidson* court also cited *Potts v. Crafts* (1935) 5 Cal.App.2d 83, 84 [42 P.2d 87], where another California court stated that "[t]he proprietor of a public place of amusement owes to his patrons the duty of using ordinary or reasonable care to see that they are not injured. [Citations.]" (See *Davidson, supra,* at p. 387.) Thus, the majority is simply incorrect in asserting that "California law"—and presumably, the majority means California *case* law—"has consistently" included "amusement park rides like roller coasters" within the "definition" of the term "carrier of persons for reward" in sections 2100 and 2101. (Maj. opn., *ante,* at p. 1133.) The majority is also incorrect in asserting that "[t]here is an unbroken line of authority in California classifying recreational rides as common carriers." (Maj. opn., *ante,* at p. 1132.)

Disregarding this authority, the majority relies on two California decisions involving amusement park rides (maj. opn., *ante,* at p. 1133), but neither of them is persuasive authority for the majority's holding that Disney, in operating the Indiana Jones ride, is a "carrier of persons for reward" within the meaning of sections 2100 and 2101. In *Barr v. Venice Giant Dipper Co., Ltd.* (1934) 138 Cal.App. 563 [32 P.2d 980], where the plaintiff was injured on a roller coaster, the question as posed by the court was not whether the operator actually was a "carrier of persons for reward" under section 2100, but whether it was "subject to the rule of liability applicable to common carriers." In concluding that the trial court had not erred in giving instructions that "charg[ed] the [defendant] with the utmost care and diligence required of a common carrier of persons under section 2100," the court made no statutory analysis and did not even cite the statutory language. (*Barr, supra,* 138 Cal.App. at p. 564.) Nor did it consider decisions that had applied an ordinary negligence standard to operators of places of amusement. Instead, it relied on non-California decisions in which courts, although *declining* to find that amusement ride operators technically are common carriers, held such operators to a heightened standard of care as a matter of policy and ordinary negligence law. (*Ibid.*) Thus, properly understood, *Barr* holds only that the roller coaster operator in that case was subject to a heightened standard of care based on these considerations, and not as a "carrier of persons for reward" under section 2100. Of course, the question of whether *we* should hold Disney to a heightened standard of care based on such considerations is a separate question from the question at issue here: whether *the Legislature* has imposed that standard of care on Disney in its operation of the Indiana Jones ride as a "carrier of persons for reward" within the meaning of section 2100. To the extent the majority views *Barr* as persuasive authority regarding the latter question, it errs.[3]

---

[3] *Barr* cited the following decisions: *Cooper v. Winnwood Amusement Co.,* (1932) 227 Mo.App. 608 [55 S.W.2d 737, 742] (" 'the higher courts of this country . . . have been slow in holding that' " a roller coaster operator " 'is technically a common carrier,' " although " 'they

 The other decision the majority cites—*Kohl v. Disneyland, Inc.* (1962) 201 Cal.App.2d 780 [20 Cal.Rptr. 367]—also offers little support for the majority's holding. There, the plaintiffs, who were injured while riding a horse-drawn stagecoach at Disneyland, were appealing from a judgment in favor of Disneyland. (*Id.* at p. 782.) The only question raised on appeal was whether there was "substantial evidence" to support the jury's verdict. (*Ibid.*) Although in answering this question, the court asserted that a "passenger-carrier relationship" existed between the plaintiffs and Disneyland (*id.* at p. 787), it offered no analysis to support its assertion; it failed to examine either the relevant statutory language or the 1872 Legislature's intent in summarily asserting that such a relationship existed. Nor did it consider our decision in *McCordic*, where we applied "well settled" California law regarding the liability of operators and proprietors of places of amusement. (*McCordic, supra*, 23 Cal.2d at p. 6.) These analytical omissions may have resulted from the case's procedural posture and the parties' contentions; Disneyland did not raise the issue on appeal, probably because it won in the trial court and was defending the verdict on appeal based only on the

---

do hold that the rule in reference to the degree of care required of a common carrier applies to the operation of such devices' "); *Brown v. Winnwood Amusement Co.* (1931) 225 Mo.App. 1180 [34 S.W.2d 149, 152] (same); *Bibeau v. Fred W. Pearce Corp.* (1928) 173 Minn. 331 [217 N.W. 374, 376] ("[t]he rule which subjects the roller-coaster and the common carrier to the same degree of care rests upon principle and is supported by a sound public policy"); *Sand Springs Park v. Schrader* (1921) 82 Okla. 244 [198 P. 983, 987] (imposing heightened standard of care based on ordinary negligence law, while declining to "draw an analogy between the rule that applies to the common carrier of passengers for hire and those who carry passengers on scenic railways for hire" and "doubt[ing] the practicability . . . of drawing such an analogy"); *Best Park & Amusement Co. v. Rollins* (1915) 192 Ala. 534 [68 So. 417] (in scenic railway case, applying heightened standard of care based on ordinary negligence law, while noting "grave doubt" about "whether the operation of a 'scenic railway' in an amusement park . . . can be properly designated as a common carrier of passengers"); *Tennessee State Fair Assn. v. Hartman* (1915) 134 Tenn. 159 [183 S. W. 735, 736] ("[w]e are not to be understood as saying that the [ride] operator was a technical common carrier," and "[w]e are treating only of the measure of care to be observed by him"); *O'Callaghan v. Dellwood Park Co.* (1909) 242 Ill. 336 [89 N.E. 1005, 1007] ("by fair analogy" and "on reason and sound public policy," holding scenic railway operator "to the same degree of responsibility . . . as a common carrier").

 The majority cites these same decisions in support of its conclusion. (Maj. opn., *ante*, at pp. 1137–1138.) However, because, as I have explained, the courts in these cases did *not* hold that amusement ride operators actually are common carriers, but applied a heightened standard of care to such operators as a matter of policy and ordinary negligence law, none of these decisions supports the majority's holding that Disney *is* a "carrier of persons for reward" within the meaning of sections 2100 and 2101. The same is true of the remaining out-of-state cases the majority cites to support its holding. (Maj. opn., *ante*, at p. 1137, citing *Lyons v. Wagers* (1966) 55 Tenn.App. 667 [404 S.W.2d 270, 274] ["operator of an amusement ride owes his patrons the same degree of care owed by a common carrier to its passengers"], and *Lewis v. Buckskin Joe's, Inc.* (1964) 156 Colo. 46 [396 P.2d 933, 939] [in determining standard of care applicable to operators of amusement park ride, "[i]t is not important whether defendants were serving as a carrier"].)

adequacy of the evidence. Whatever the reason, "it is axiomatic that cases are not authority for propositions not considered. [Citations.]" (*People v. Alvarez* (2002) 27 Cal.4th 1161, 1176 [119 Cal.Rptr.2d 903, 46 P.3d 372].) Finally, *Kohl* did not involve a thrill ride like the one at issue here, but involved a traditional form of transportation: a horse-drawn stagecoach. (*Kohl, supra*, at p. 782.) As noted above, this mode of transportation was specifically mentioned in the Commission's notes. (Code commrs., notes foll. Ann. Civ. Code, § 2168, *supra*, at pp. 27–28.) As also noted above, the Indiana Jones ride bears no resemblance to a horse-drawn stagecoach. For all of these reasons, *Kohl* is of little, if any, help in this case.[4]

The majority also relies on a number of other California cases that did not involve amusement parks or amusement park thrill rides, but these decisions are unpersuasive whether considered individually or as a group. Collectively, the cited cases involved conventional and obvious modes of transportation: elevators, escalators, airplanes, mules, and ski lifts. (*Smith v. O'Donnell* (1932) 215 Cal. 714 [12 P.2d 933] (*Smith*); *Treadwell v. Whittier* (1889) 80 Cal. 574 [22 P. 266] (*Treadwell*); *Squaw Valley Ski Corp. v. Superior Court* (1992) 2 Cal.App.4th 1499 [3 Cal.Rptr.2d 897] (*Squaw Valley*); *Vandagriff v. J.C. Penney Co.* (1964) 228 Cal.App.2d 579 [39 Cal.Rptr. 671] (*Vandagriff*); *McIntyre v. Smoke Tree Ranch Stables* (1962) 205 Cal.App.2d 489 [23 Cal.Rptr. 339] (*McIntyre*).) The purpose of these instrumentalities is, first and foremost, to provide secure and uneventful transportation, even if within the context of entertainment or recreation. In this regard, they bear no resemblance to the Indiana Jones ride, the purpose of which is not to provide transportation at all, but to frighten and thrill riders by moving them at excessive speeds and, as alleged in the complaint, "jarring" them with "jumps, drops, and unpredictable movements." Moreover, none of the cited decisions considered the "well settled" California law we applied in *McCordic* regarding the liability of operators and proprietors of places of amusement. (*McCordic, supra*, 23 Cal.2d at p. 6.)

A closer look at these decisions reveals additional reasons why each is inapposite. In *Treadwell*, a negligence action, the plaintiff was injured while riding in an elevator, which " 'was used and intended to be used . . . for the purpose of transporting and carrying [the defendants'] customers . . . to and from the different floors of' " the defendants' store. (*Treadwell, supra*, 80 Cal. at pp. 576–577.) In determining the applicable standard of care, we neither cited nor referred to any of the California statutes governing carriers. Nor did we ever use the statutory term at issue here: "carrier of persons for

---

[4] In its discussion of California law, the majority cites one other case involving an amusement park ride: *Neubauer v. Disneyland, Inc.* (C.D.Cal. 1995) 875 F.Supp. 672. (Maj. opn., *ante*, at p. 1133.) However, *Neubauer* is a decision of a federal district court construing California law. It offered little analysis for its conclusion.

reward." (§§ 2100, 2101.) Thus, it appears that *Treadwell* was not a statutory decision at all, but was a policy or common law decision that the "degree of responsibility" that attaches to stagecoach and railroad operators "must attach to one controlling and running an elevator." (*Treadwell, supra,* at p. 591.) As a policy matter, the opinion declared that a heightened standard "attaches to all persons engaged in employments where human beings submit their bodies to their control by which their lives or limbs are put at hazard, or where such employment is attended with danger to life or limb." (*Ibid.*) Nor did we hold that elevator operators actually are carriers; rather, we held that for policy reasons, such operators must be treated "[l]*ike* common carriers of passengers." (*Id.* at p. 600, italics added.) Our subsequent decisions confirm this view of *Treadwell.* Less than two years after issuing *Treadwell,* we explained that it "*likened*" the duties of a proprietor of a passenger elevator to "the duties imposed upon the carrier of passengers." (*Sappenfield v. Main St. & A.P.R. Co.* (1891) 91 Cal. 48, 55 [27 P. 590], italics added.) A few years later, citing only *Treadwell,* we stated: "In determining the liability of the owner of an elevator for injury to a passenger this court has long been committed to the doctrine that the responsibility is *analogous to* that of a common carrier." (*Wilmarth v. Pacific Mut. Life Ins. Co.* (1914) 168 Cal. 536, 542 [143 P. 780], italics added.) Because *Treadwell* involved an obvious form of transportation, did not construe the applicable statutes, and did not hold that the elevator operator actually was a carrier, it does not support the majority's holding in this case.

For a number of reasons, our subsequent decision in *Smith* is similarly unhelpful. First, the plaintiff in *Smith* was injured while riding in an airplane, another obvious and conventional form of transportation. (*Smith, supra,* 215 Cal. at p. 715.) Indeed, *Smith*'s discussion emphasized the need to protect those using this "*mode of transportation,*" i.e., members of the public who have accepted the "invitation" of the airline "industry . . . to travel by air." (*Id.* at p. 720, italics added.) As noted above, an airplane, which is designed as a means of transportation, bears no resemblance to the Indiana Jones ride, which is simply an amusement device. Second, although *Smith* briefly cited both sections 2100 and 2101, it contains no analysis of the statutes and does not examine the 1872 Legislature's intent. Instead, like *Barr,* it extensively relied on out-of-state decisions in which courts, although *declining* to find that amusement ride operators technically are common carriers, held such operators to the same standard of care as a matter of policy and ordinary negligence law. (*Smith, supra,* 215 Cal. at p. 719.) *Smith* endorsed these decisions not based on the statutory language or the Legislature's intent, but on "consideration[s] of public policy." (*Ibid.*) As noted above, the question of whether *we,* as a policy matter, should hold Disney to a higher standard of care is different from the question now before us: whether *the Legislature* has

required us to apply that higher standard to Disney as a "common carrier of persons for reward" within the meaning of section 2100.

The third reason why *Smith* is of little help here is that its relevant discussion is dictum in several respects. To begin with, in asserting that he was not a " 'common carrier,' " the airplane operator in *Smith* argued only that " 'there must be "the carriage of the thing or person from one place to another *on terra firma*" in order to constitute a common carrier and . . . that "so new a craft, so new an industry" ought not to "be so classified and charged with such a liability." ' " (*Smith, supra,* 215 Cal. at p. 717.) Thus, *Smith*'s discussion of the relevance of a passenger's motive—which the majority's finds determinative here (maj. opn., *ante,* at pp. 1135–1136)—was simply not at issue in the case. More broadly, *Smith*'s entire discussion of the common carrier issue was dicta. In *Smith,* we reversed the judgment against the airplane operator because, in light of the trial court's erroneous instructions regarding the liability of a codefendant, " 'there was no proper guide by which the jury could determine whether the collision was caused solely by the [codefendant's] negligence.' " (*Smith, supra,* at p. 723.) Thus, to decide the case, it was unnecessary in *Smith* to discuss the operator's argument that he was not a common carrier under California law. (*Id.* at p. 717.) We did so anyway, "[d]ue to the novelty of the questions involved" in applying the law to "airplanes." (*Id.* at p. 715.) Of course, we are not bound by such dicta, especially given our subsequent holding in *McCordic* that the ordinary negligence standard of care applies to proprietors of rides at amusement parks.[5]

---

[5] In any event, my analysis does not depend on the factor discussed in *Smith*'s dicta: " 'the motive which causes a person to take passage.' " (*Smith, supra,* 215 Cal. at p. 719.) Rather, it depends on the nature and purpose of the device in question. Thus, if the device at issue is fundamentally a means of transportation, then the operator is a "carrier of persons for reward" (§§ 2100, 2101) whether the rider is on business, is traveling on vacation, or is simply along for the ride. But where the device in question is not fundamentally a means of transportation, the operator does not become a "carrier of persons for reward" within the meaning of sections 2100 and 2101 simply because movement is involved. With regard to such devices, the rider simply is not " 'tak[ing] passage.' " (*Smith, supra,* 215 Cal. at p. 719.)

As the preceding discussion demonstrates, the majority errs in asserting that under my reasoning, a roller coaster operator is a carrier of persons if the ride starts on one level and ends on another, but not if the ride begins and ends at the same place. (Maj. opn., *ante,* at p. 1138–1139.) My analysis produces the same conclusion in both cases, based on the fact that a roller coaster is not designed to provide transportation and serves no transportation function. The majority also errs in equating a helicopter and a roller coaster. (Maj. opn., *ante,* at p. 1139.) The former is designed to provide smooth, secure and uneventful transportation; it is fundamentally a transportation device, and even during a round-trip "sightseeing ride" (*ibid.*), its primary function is to take passengers from place to place. By contrast, a roller coaster is not designed to provide transportation at all; its function is solely to thrill riders, and the physical movement along the track is purely incidental to the ride's purpose. Thus, a roller coaster no more "transport[s]" its riders (*ibid.*) than does a mechanical bull. (See *People v. Cortez* (1985) 166 Cal.App.3d 994, 998 [212 Cal.Rptr. 692] [as "commonly understood," the

The remaining California decisions the majority cites—all from our Courts of Appeal—also offer little support for the majority's holding. In *McIntyre*, the plaintiff was injured while riding a mule in a mule train, and the only argument the court addressed was the mule train operator's argument that because he simply rented the plaintiff a mule and had no control over the mule when the accident occurred, he was "not a carrier of any kind." (*McIntyre, supra*, 205 Cal.App.2d at p. 491.) The operator did not rely on, and the court did not discuss the significance of, the fact that the plaintiff was being carried merely for recreational purposes. In rejecting the operator's argument, the court stressed that the operator "used mules as a means of transportation" to "conduct[] guided tours . . . over a scenic route." (*Id.* at p. 490.) Moreover, the court based its decision on section 2168, finding that there was "an agreement of carriage" within the meaning of that provision because the operator "operated a mule train for the purposes of taking passengers over a designated route *between fixed termini.*" (*Id.* at p. 492, italics added.) In *Squaw Valley*, which involved a chair lift at a ski resort, the court also applied section 2168, finding that the lift operator was a "common carrier" within the meaning of that provision because the operator "carr[ied] skiers at a fixed rate from the bottom to the top of the [ski] run." (*Squaw Valley, supra*, 2 Cal.App.4th at p. 1508.) In reaching its conclusion, the court explained that "a common carrier within the meaning of . . . section 2168 is any entity which holds itself out to the public generally and indifferently to transport goods or persons from place to place for profit. [Citations.]" (*Ibid.*) Moreover, unlike the majority, which suggests that the lift operator in *Squaw Valley* was offering "recreational rides" (maj. opn., *ante*, at p. 1132), the court in *Squaw Valley* properly characterized the lift operator as "a transportation company." (*Squaw Valley, supra*, at p. 1513.) Thus, both *McIntyre* and *Squaw Valley* involved obvious forms of transportation, and both decisions stressed the transportation purpose and function in finding that under section 2168, the operators were common carriers. As I have already explained, the purpose and function of the Indiana Jones ride is not to provide transportation at all, but is to provide thrills.

Finally, *Vandagriff*, to the extent it is relevant, actually is more supportive of my analysis than the majority's. There, the plaintiff sued after being injured on an escalator. Although the appellate court asserted, without analysis, that "[a]n escalator in a department store is a common carrier," the principal case it cited in making this assertion—*Hendershott v. Macy's* (1958) 158 Cal.App.2d 324 [322 P.2d 596]—did *not* hold that a escalator operator *is*

term " '[t]o transport means to carry or convey from one place to another' [citation]"; see also *Golden Gate Scenic Steamship Lines, Inc. v. Public Utilities Com.* (1962) 57 Cal.2d 373, 380 [19 Cal.Rptr. 657, 369 P.2d 257] [" 'transportation' . . . has been judicially defined as implying 'the taking up of persons or property at some point and putting them down at *another*' [citations]"].)

a common carrier. (*Vandagriff, supra,* 228 Cal.App.2d at p. 582.) Rather, *Hendershott* held that such an operator "is held to the duty of utmost care and diligence *analogous to* that required of a common carrier. [Citation.]" (*Hendershott v. Macy's, supra,* at p. 328, italics added.)[6] More importantly, in applying a heightened standard of care, the *Vandagriff* court rejected the escalator operator's reliance on *Kataoka v. May Department Stores Co.* (1943) 60 Cal.App.2d 177 [140 P.2d 467], explaining that the court in that case had declined to apply that standard of care because the plaintiff there "was not using the escalator *as a means of transportation,* but was playing" on it. (*Vandagriff, supra,* 228 Cal.App.2d at p. 582, italics added.) Indeed, in *Kataoka,* the court expressly refused to apply the heightened standard of care to an escalator operator, reasoning: "Plaintiff here was not using the escalator as a means of transportation when he was injured . . . . [His] activities . . . bore no relation to the matter of transportation. . . . He was, at the time in question, simply a business invitee of defendant corporation, and to him it owed the duty which exists in all such cases, that is, to use ordinary care to keep the premises reasonably safe for those so invited to go upon them. [Citations.]" (*Kataoka, supra,* 60 Cal.App.2d at p. 182.) Thus, both *Vandagriff'*s discussion and the decision in *Kataoka* are consistent with our decision in *McCordic,* which held that the standard of ordinary care governs the liability of proprietors and operators of amusement parks to invitees who are injured on amusement park rides. They also support my conclusion that in operating the Indiana Jones ride, which is not and was not intended to be a means of transportation, Disney is not a "carrier of persons for reward" within the meaning of sections 2100 and 2101.

### IV. *Conclusion*

For the reasons stated above, I would hold that Disney, in operating the Indiana Jones ride, is not a "carrier of persons for reward" within the meaning of sections 2100 and 2101, and that plaintiffs therefore cannot state causes of action under these statutes. In my view, the majority's contrary conclusion is inconsistent with the Legislature's intent, ignores our well-settled law regarding the liability of operators of amusement park rides, improperly extends to such operators the law that applies to operators of true transportation devices, and misconstrues decisions that have imposed a heightened standard of care on operators of thrill rides not because they are common carriers, but as a matter of policy and ordinary negligence law.

---

[6] *Vandagriff* also cited *Simmons v. F.W. Woolworth Co.* (1958) 163 Cal.App.2d 709 [329 P.2d 999]. However, in that case, the court did not analyze the issue, but simply accepted the parties' "stipulat[ion] . . . that the defendant's operation of the escalator placed it in the category of a common carrier." (*Id.* at p. 710.)

In reaching this conclusion, I am not unmindful of the tragedy that lies at the heart of this case: the death of a young woman just embarking upon married life. Nor am I advocating for any kind of special liability exemption for the amusement park industry. On the contrary, I would fully apply our ordinary negligence law in assessing Disney's responsibility, if any, for the death of Ms. Moreno, and thus would require a determination of whether Disney took precautions commensurate with the risks posed by the Indiana Jones ride. I would not, however, contort our common carrier law—which is a bad fit for amusement park thrill rides—simply to subject Disney to the heightened standard of care applicable to such carriers. I therefore dissent.

Baxter, J., and Wiseman, J.,[*] concurred.

---

[*]Associate Justice, Court of Appeal, Fifth Appellate District, assigned by the Acting Chief Justice pursuant to article VI, section 6, of the California Constitution.