Filed 6/1/15  Roger v. Magic Mountain CA2/8

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| CHARLES ROGERS, | B254151 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. No. PC051793) |
| v. | |
| MAGIC MOUNTAIN, LLC et al., | |
| Defendants and Respondents. | |

APPEAL from a judgment of the Superior Court for the County of Los Angeles. Stephen P. Pfahler, Judge.  Affirmed.

Wagner & Pelayes, Amanda J. Parker, Tristan G. Pelayes and Dennis E. Wagner for Plaintiff and Appellant.

Prindle, Amaro, Goetz, Hillyard, Barnes & Reinholtz, Michael L. Amaro and Sanaz Cherazaie for Defendant and Respondent Magic Mountain, LLC.

LeClairRyan, Robert G. Harrison and Charles H. Horn for Defendant and Respondent S&S Worldwide, Inc.

_____

## SUMMARY

Plaintiff Charles Rogers, who has suffered from paraplegia and related medical complications since an accident in 1996, rode the X2 "4th Dimension" roller coaster at the Six Flags Magic Mountain amusement park in Valencia on October 2, 2010. Although he did not realize it at the time, the forces of the X2 ride caused a fracture to his right femur (which, likely because of a hip dislocation and surgery many years ago, was no longer attached to the hip joint). A few days later, his right leg was amputated after blood clotting blocked the flow of blood to the leg.

Plaintiff sued Magic Mountain LLC and S&S Worldwide Inc. (the company that designed and manufactured the X2 vehicles). A jury found, by special verdict, that Magic Mountain was negligent, but its negligence was not a substantial factor in causing harm to plaintiff. As to S&S, the jury found that the X2 vehicles did not have potential risks that were known at the time of their design, manufacture and sale; that the design was a substantial factor in causing harm to plaintiff; but that the risks of the X2 vehicles did not outweigh the benefits of the design. Consequently, the jury found that neither Magic Mountain nor S&S had any responsibility for the harm to plaintiff.

On appeal, plaintiff contends the special verdict form, to which all parties agreed, was "fatally inconsistent" and otherwise defective, and that the evidence was insufficient to support the special verdict. We find no error and affirm the judgment.

## FACTS

### 1. The Background and Circumstances of Plaintiff's Injury

After the 1996 automobile accident that paralyzed him from the waist down, plaintiff tried to live as normal a life as possible, an effort encouraged by his doctors, who put no limitations on his activities. He lived at home with his mother and a caregiver, drove his own van, engaged in woodworking and van maintenance activities and other activities. His wife and children lived in the State of Washington, and the family planned an outing to Magic Mountain during one of their trips to see plaintiff in October 2010.

Plaintiff's paraplegia caused other medical complications in his life. These included a history of deep vein thrombosis (blood clotting in the veins of his lower

2

extremities).  Plaintiff took anti-coagulation (blood-thinning) medication to reduce the risk of blood clots, but had been taken off that medication about a week or so before the trip to Magic Mountain.  (In the several instances when plaintiff was treated for blood clots in his veins, he was not taking the blood-thinning medication.)  Other medical problems included bed sores; chronic pain in his right groin; high blood pressure controlled by medication; and chronic low back pain (for which he took Vicodin on a daily basis at the time of the Magic Mountain incident).  Plaintiff had also been told during his rehabilitation from the 1996 accident that his bones would deteriorate over time due to lack of movement, and the deterioration would get worse over time.

Two days before the outing to Magic Mountain, plaintiff was taken to a hospital by ambulance after experiencing severe pain in the right groin for three days.  He was released the same day, after being given a cream to treat MRSA (Methicillin-resistant Staphylococcus aureus, a bacterium causing infection).  The records noted that plaintiff "want[ed] to go home," and that his doctor would discharge him "on the understanding if he has any sudden changes in his condition, he is to call me."

When they arrived at Magic Mountain, one of plaintiff's group picked up a "disability guide."  This guide advised that guests in wheelchairs could use the "flash pass" entrance gate, and plaintiff did so at the X2 ride.  Warning signs were posted there.

The warnings included:  "Don't go on if you have had a recent illness or surgery." "Don't go on if you have a heart condition."  "Don't go on if you have back, neck ailments" (or "Don't go on if you have neck or back problems").  "For your safety, you should be in good health to ride.  X2 uses special effects such as lightning, sound, theatrical fog, and flame effects, and only you know your physical conditions or limitations.  If you suspect your health could be at risk for any reason or you can aggravate a preexisting condition of any kind, DO NOT RIDE!"

The signs also said:  "Attention all guests.  Read important safety information. Follow instructions of attendants."  The signs described X2 as a "high thrill" ride, and told patrons that it had "high speeds, steep drops, fast turns, multiple inversions and sudden stops."  A sign at the X2 ride said:  "There are inherent risks in the participation

3

in or on any amusement ride or attraction. Patrons have a duty to exercise good judgment and act in a responsible manner while participating on the ride or attraction, and to obey all oral and/or written warnings. Patrons also have a duty to properly use all ride or attraction safety equipment provided."

During the day at Magic Mountain, plaintiff rode two other rides (Scream and Riddler's Revenge) before the X2, and after the X2 rode on the Dive Devil. At both the Scream ride and the X2, he told the attendant he was paralyzed from the waist down and asked if he could ride; he was told that "if I can get on the ride, I can ride it."

Plaintiff did not see or read the warning signs. He knew the X2 had steep drops and "would be going pretty fast." At the ride, he told the attendant he was paralyzed from the waist down, but did not tell the attendant he was taking medication every day for chronic back pain, or about any of his other medical conditions. (Ride attendants are trained to call a supervisor if a park guest discloses a medical condition mentioned on the warning signs, and such guests are not allowed to ride.) When plaintiff was seated on the ride and before the restraint was closed, plaintiff was aware his legs were suspended from the seat itself, and were not strapped in or secured in any way. Plaintiff was seated in the outside chair of the front car, next to his stepson who was seated in the inside chair, to plaintiff's left.

According to plaintiff, during his ride on the X2, "my legs took off. This one [(the left leg)] went over and hit my stepson in his head. And then . . . this one [(the right leg)] would go out to the side. This one [the left leg] would go no farther . . . because it kept hitting Adam [(plaintiff's stepson)], hitting the other car, hitting Adam in his head. But the other leg [(the right leg)], depending on which way we would turn, it would go off to the side, come back down, then it would go off this way and come back down, all the way until the ride ended." Plaintiff's right leg "was going up above my head," and his left leg hit his stepson "[a]t least six or seven times."

When the ride came to a stop, "the lady that was running the controls came down and asked me if I was all right. I told her, 'Yeah. I feel all right,' you know." The other attendant brought the wheelchair, plaintiff got off the ride and into his wheelchair, and

4

"went off to another ride." Plaintiff did not know his femur was broken because he could not feel it. Plaintiff remained at the park for seven or eight hours after riding the X2; "[t]hey were just getting ready to close the park when we left."

Plaintiff then drove home to Victorville, normally about a two-hour drive. He stopped twice during the drive, for 15 or 20 minutes each time, because he "was having hot flashes," which he attributed to being overly exhausted from the excitement of the day. According to plaintiff, when he arrived home, around 2:00 on Sunday morning, he immediately went to bed, remaining dressed in his sweatpants, and "was out like a light." He awoke the next afternoon (Sunday), and called his caregiver to come and change his diaper. When the caregiver took plaintiff's sweatpants off, they noticed his leg was "a little red, maybe a little swollen." It was not uncommon for his legs to swell, and because he had a doctor's appointment the next day (Monday), he decided "that I would just wait until the next day and go to my doctor's appointment."

According to deposition testimony from plaintiff's caregiver, Dina Albietz, she saw plaintiff the night he returned home from Magic Mountain, and did the typical things, putting plaintiff to bed and helping him undress. She saw a portion of his right thigh, "and it looked red." Plaintiff told Ms. Albietz that he had had to pull over a couple of times on the way home. When she saw his leg looked red, Ms. Albietz asked "if he felt maybe if he needed to" go to the doctors, and plaintiff said "he didn't think he needed to." The next time Ms. Albietz saw plaintiff was the next day (Sunday), in the morning. She looked at his leg again "when it got more redder," and "[t]he right leg just got more red as the time went on." Once or twice on Sunday she brought up the subject of his right leg, and on Sunday afternoon asked him about going to the hospital. Plaintiff declined to go to the emergency room; "he had a doctor's appointment the next day, and basically that's what we agreed on that he would wait and go to the doctor."

Ms. Albietz saw plaintiff again between 8:00 and 10:00 on Monday morning for his normal routine, and his leg "was like to the point where I felt he needed to go to the hospital." His leg was "reddish purple. I think it's the start of when, to me, it looked purple."

When plaintiff arrived for his appointment on Monday afternoon, the doctor (Dr. Vargas, his primary doctor) told him to go to the emergency room. After first returning home for "[i]t seems like a couple of hours," plaintiff went to the emergency room at St. Mary's. After examining him, the hospital staff put him in an ambulance for transport to Loma Linda University Medical Center, to have his leg amputated. Doctors told him the leg "was dead completely."

## 2. The Lawsuit and Trial

Plaintiff sued defendants, asserting causes of action for premises liability, general negligence and products liability. The trial court denied Magic Mountain's summary judgment motion. A 10-day jury trial ensued. In addition to the facts we have described, the parties presented other evidence including the following.

### a. The stipulations

Plaintiff and defendant Magic Mountain stipulated that "[o]n October 2, 2010, and prior thereto, defendant Magic Mountain does not dispute that excluding paraplegic riders on X2 was feasible. Defendant, however – defendant does, however, dispute any negligence in this matter."

The parties stipulated that "on October 2nd, 2010, the fracture to Charles Rogers's right femur was caused by the forces of the X2 ride. [¶] Defendant Magic Mountain denies any negligence in this matter. Defendant S&S denies any product defect."

### b. The medical testimony

Plaintiff's medical expert, Dr. Steven Graboff, an orthopedic surgeon, testified that plaintiff sustained two injuries: a fracture of the upper part of his right femur, "right in the area of the hip," and damage to the femoral artery that provides the blood supply to the leg, causing the artery to become blocked and stopping all the blood from flowing into plaintiff's right leg. Dr. Graboff testified that both injuries were caused by the forces of the X2 ride.

Dr. Graboff opined there were "two mechanisms by which the artery . . . was damaged." One was that the artery got compressed against the bone, and compression from the fracture "is one reason that this could have gotten a blood clot and it could have

6

shut off the circulation to his leg." The other reason had nothing to do with the fracture; the uncontrollable and excessive movement of the leg stretched the artery too far, tearing the inner lining (or intima) of the artery, and a blood clot always forms "when you get an intimal tear."

On the other hand, defendant's medical expert, D. Preston Flanigan, a vascular surgeon, testified that "the X2 ride[] did not cause the clotting to the lower right leg." Dr. Flanigan based his opinion on his examination of medical and other records, including the deposition and operative report of the surgeon, Dr. Abou-Zamzam, who amputated plaintiff's leg. The latter records indicated that Dr. Abou-Zamzam did not find any injury to the inside of the artery, but only a "fairly minimal" bruise on the outside of the upper part of the superficial femoral artery.

Using a drawing for illustration, Dr. Flanigan testified that Dr. Abou-Zamzam "didn't find any injury up in the common femoral artery at all," and "that's where he opened and passed the balloon catheter . . . that he used to pull out the clot." Further, "even if there were an injury to the inside of the artery and that injury did cause this artery to clot off, that would not explain why this artery up here, the external iliac, the common, and the profunda femoris artery, as well as the arteries downstream, clotted off." Dr. Flanigan explained that blood will not clot "as long as it's moving at a reasonably actually slow pace." "And so when the blood is coming down here and there's an injury to this artery, these arteries over here are all still open. And so there's a fairly good speed of blood coming through this artery up here into these arteries here (indicating)." "So even – even if this was an injury there, which was never demonstrated, that should not cause all of the arteries to clot off, which is basically what the surgeon found when he did his procedure."

Thus, assuming there was a blood clot in the location of the bruise, that location was "below where those [other] arteries branch off," and "through that mechanism blood can still get back into the mainly [*sic*] channel below the blockage and go on down to the calf and foot." Dr. Flanigan explained this in detail, and opined that if there had been a

7

blockage at that location, the blood supply, albeit reduced, most likely would have been sufficient to oxygenate the tissues in the lower right leg.

Dr. Flanigan testified that if there had been any damage to the intimal lining of the artery at the location of the bruise, he would expect the surgeon's report to indicate that damage, and to repair it, but no repair was done. Instead, the surgeon's report showed diffused clotting "in all the major arteries" of the right leg, "basically" everywhere. Assuming an injury to the artery due to trauma from stretching or contact with the bone, the injury would be localized, not diffuse.

Dr. Flanigan opined that the X2 ride did not cause the diffused blockage the surgeon recorded. The cause was "[m]ost likely a problem with the patient's blood that causes it to clot a little more readily than other people's blood," "[a] hypercoagulable state." Dr. Flanigan stated these were "well-known syndromes," "numerous" ones, "sometimes based on genetic defects or sometimes acquired," and "[w]e can test for probably about 75 percent of them and find the abnormalities." Plaintiff's previous history of blood clotting was "consistent with the problems with the blood." A contributing factor to plaintiff's "hypercoagulable state" was that "he was off his blood thinner medication a week before."

Dr. Flanigan expressly disagreed with Dr. Graboff's opinion that the blockage to the intimal lining in the superficial femoral artery was the cause of the amputation, "[b]ecause there would still be a tremendous amount of flow getting down the leg through the profunda femoris artery."

Dr. Flanigan also opined that the clotting "occurred, most likely, on Sunday." He based that opinion "primarily on the description of the caregiver on Saturday night who described the leg as red." When an artery is blocked, "whatever that artery supplies" is not getting oxygenated blood "and so it turns white not red." Dr. Flanigan attributed the redness on Saturday night to "possibly some surface trauma" if the leg "was flailing around and bumping into things," but "that is not consistent with an acute arterial occlusion." And even if there had been a break in the intimal lining, "very often" blood clotting does not form right away; sometimes it is "a couple of days before it clots."

8

Dr. Flanigan opined that, more likely than not, if plaintiff had gone to the emergency room Sunday rather than waiting until Monday afternoon, the leg would have been salvageable.

Dr. Flanigan concluded by testifying that the diffuse blood clotting that ultimately led to the amputation of plaintiff's leg "had nothing to do with the ride forces."

There was also testimony about the absence of a connection between plaintiff's right femur and the hip joint. A 2009 X-ray showed that plaintiff's right hip was dislocated and the femur bone had no head and was out of its socket. (Plaintiff was unaware of having had any surgery to remove the head of the femur bone and leave it out of place, and there were no medical records showing such a surgery.) Plaintiff's expert, Dr. Graboff, testified surgery was the most reasonable explanation for the absence of the head of the femur, but it was possible "that simply it dislocated years ago, and [plaintiff's] body just absorbed the material, absorbed the head." At the time of the incident, the femur was not being held in place by the hip joint. Dr. Graboff testified plaintiff "[did not] have a hip anymore. It's been removed." He also testified that plaintiff suffers from osteoporosis (decreased bone density) in the femur.

### c. Other testimony

Other witnesses testified on other relevant topics.

The predecessor to the X2 ride (the X) was designed by Arrow Dynamics and placed in service at Magic Mountain in 2002. In 2008, Magic Mountain launched the X2 after defendant S&S redesigned the X to reduce the weight of the vehicles. S&S did not change the restraint system, the track design, or the controls of the ride.

Under accepted protocol in the amusement industry, the manufacturer's responsibility for design includes establishing the rider criteria for the ride. S&S provided Magic Mountain with an X2 manual containing a section on passenger restrictions, and Magic Mountain followed those restrictions. The manual indicates that passengers with physical disabilities must be able to be secure in their restraints; riders "must be able to comply with the restraint device," that is, "sit in the seat and be held by the restraint." The "rider policies" in Magic Mountain's standard operating procedure

9

manual for the X2 were taken from S&S's manual, and stated that "[d]isabled guests may ride if they can maintain an upright position and utilize all safety restraints as intended."

Several witnesses testified that plaintiff's injuries could not have occurred as he described (that is, that his "legs were flying all over the place; his left leg hit his son in the head, and the right leg went flying outward"). Dr. Charles Bain, a medical doctor with an engineering degree and an expertise is biomechanics and accident reconstruction, described the testing he did on the X2 ride, and opined, based on his testing, "that did not happen." If it had happened, Dr. Bain would expect to see significant pelvic fracture, bladder disruption and other substantial injuries that did not occur here. From an engineering point of view, the X2 ride did not "exert the necessary force to cause [plaintiff's] legs to fly up, as stated." Dr. Bain also opined the X2 ride was safe for a person without lower body restraints.

Dal Freeman, the director of engineering at another amusement park, with experience in the design of roller coasters, also testified that the X2 does not "produce enough negative G's [(gravitational forces)] in the vertical z-axis for the legs to be flying up, as claimed by the plaintiff in his deposition."

Lawrence Chickola, the chief engineer of Six Flags who oversees engineering at all Six Flags amusement parks, testified about industry standards that apply to amusement park rides. An "F-24 Committee" of the American Society of Testing and Materials (ASTM) writes the safety standards for amusement park rides. Mr. Chickola was a past chairman of the acceleration committee, and participated in drafting the ASTM standards for safe levels of acceleration on amusement park rides. Mr. Chickola testified that the gravitational forces (G-forces) and their durations on the X2 were well below the limits established by the ASTM standard for ride accelerations.

Another engineering expert, Alan Black, opined that the X2 ride "was safe for a paraplegic to ride provided that . . . he or she had no other medical conditions." Mr. Black's understanding was that some 200 to 400 wheelchair-bound people had successfully ridden the X2 with only one injury reported (a hairline fracture to a person's knee that contained hardware screws from a previous surgery). The industry "rule of

10

thumb" was that if disabled persons could transfer themselves, with the assistance of their companions, into the ride, and attach the restraints in the intended manner, they should be allowed on the ride.

Todd Snyder, the director of engineering for S&S, testified that all the changes S&S made to the X2 ride, when S&S redesigned it to reduce the weight of the vehicles, were "completely in line with the ASTM standards." Mr. Snyder also testified that "[p]art of the intent of the X ride is that you have an open flying type feeling. And so restraining the legs would be contrary to the intent of the ride." Adding leg restraints "would then introduce different concerns that could also damage a – or harm a person." Mr. Snyder knew of "no injuries that have occurred to anyone who's disabled on the X2 ride." He testified that when "a design . . . has been in operation five years without having any problems or safety concerns against it," the design is considered "service proven and – and that shows that it is a safe and functioning design." Mr. Snyder said that defendant S&S has manufactured three "fourth-dimension" rides similar to the X2, and he was "not aware of any injuries to a paraplegic on any of those rides."

At his deposition, Mr. Snyder answered "yes" when he was asked if one of the assumptions he made in the design of the X2 ride was "that the passenger has control or functioning of the lower extremities." At trial, he explained that "[w]hat I meant there is that there would be a functioning bone structure through that area." Mr. Snyder testified that S&S "did not address the restraint design when we did the X2 redesign work," and that as to restraint design in general, "the key item that we are considering is the skeletal function and how that relates with the restraint system and the points that the – the body can pivot at. Those are the key interactions with the restraint."

Arrow Dynamics's original design did not restrict persons with paraplegia from riding, and S&S did no testing on the effects of the ride on persons with paraplegia; Mr. Snyder did not know what testing was done by the original designers. "We continued the design that was already in place and was service-proven with five years of operation."

11

In 2005, Jon Carpenter, a person with quadriplegia, rode the predecessor X ride, and said that "his legs were flying everywhere." He did not report this to park officials that day, but sent them a letter two months later, after consulting with an attorney. The letter said that when Mr. Carpenter rode the X, he felt pain in both knees, more prominently in the right leg, and had a contusion on his right knee. The letter also advised Magic Mountain that Mr. Carpenter believed Magic Mountain was violating the Americans With Disabilities Act in other areas of the park, and made a settlement demand of $25,000. Magic Mountain declined the demand and Mr. Carpenter filed a small claims lawsuit. Mr. Carpenter did not present any medical records in the small claims case, and did not win the case.

After the Carpenter incident, Tim Burkhart, who was then director of maintenance, construction and engineering at Magic Mountain, considered whether the rider policy should be changed to exclude persons with paraplegia, but concluded that Magic Mountain's " 'policy says you need to use the restraints as intended,' " and " 'it seemed to me that he would be able to use the restraints as intended . . . ." Mr. Burkhart concluded: "And the fact that the injury that was sustained by Mr. Carpenter was so minor and did not appear to be necessarily even related to his paraplegia, because we have – it's not uncommon at all for people riding the ride to get banged or bruised or complain of a – of a pain that they may have in their neck, their shoulder, their leg, their knee. It did not seem unique enough that I would recommend that we change this policy." "It seemed to me that the – what [Mr. Carpenter] experienced in riding the ride was not all that unusual than what anybody would experience riding the ride."

Defendant Magic Mountain presented testimony indicating that, if plaintiff had informed ride attendants of his medical conditions, he would not have been allowed to ride the X2.

### 3. The Verdict

The court instructed the jury on common carrier duties, assumption of the risk, products liability, comparative negligence, and so on, without objection. The parties also agreed on a special verdict form. The form contained 14 questions. Questions 1 through

12

10 addressed plaintiff's three claims: negligence and premises liability as to Magic Mountain; failure to warn as to S&S; and design defect as to S&S. Questions 11 and 12 addressed plaintiff's negligence; question 13 addressed damages; and question 14 addressed the allocation of responsibility for the harm to plaintiff.

The jury found that defendant Magic Mountain was negligent, but its negligence was not a substantial factor in causing harm to plaintiff. So, as instructed, the jury entered "0%" in question 14, for Magic Mountain's percentage of responsibility for the harm to plaintiff. On the product liability claims against S&S, the jury found the X2 vehicles did *not* have potential risks known at the time of the design, and while the design was a substantial factor in causing harm to plaintiff, the risks did not outweigh the benefits of the design. So again, as instructed, the jury entered "0%" in question 14, for S&S Worldwide's percentage of responsibility for the harm to plaintiff. Because of these findings, the jury, as instructed in the verdict form, did not answer any questions about plaintiff's negligence or damages. The jury did, however, insert "100%" in question 14, for plaintiff's percentage of responsibility for the harm, even though the verdict form did not instruct the jury to do so (because the jury had already determined defendants were not responsible, and therefore did not answer questions on plaintiff's negligence).

Plaintiff did not object to the verdict when it was rendered, and the jury was discharged. Several days later, plaintiff filed a motion to set aside the verdict and for a new trial. The motion was denied, judgment was entered, and this appeal followed.

### DISCUSSION

Plaintiff argues (1) the special verdict was "fatally defective" because "there are irreconcilable findings" and because it "did not resolve every controverted issue"; and (2) there is insufficient evidence to support the special verdict. Neither of these contentions has merit.

### 1.     The Special Verdict

We begin with the observation that plaintiff at no point objected to the special verdict form. The only objection plaintiff ever made was to an earlier version of the form, when S&S sought to include language apportioning liability to Arrow Dynamics, a

13

defunct corporation that designed the predecessor X ride. The trial court ruled for plaintiff and refused to allow that change. After the jury retired to begin its deliberations, the court expressly asked on the record whether there were "[a]ny objections to any of the instructions that were read by the court and the exhibits and the verdict forms to go back to the jury deliberation room," and counsel replied, "Not from plaintiffs." Other changes to the verdict form, after the jury began deliberations, were made "by agreement and stipulation of all counsel." Nor did plaintiff raise any objection to the verdict when it was read in open court.

Arguably, plaintiff's failure to object before the jury was discharged forfeited his claim that the special verdict was fatally defective. (E.g., *Taylor v. Nabors Drilling USA, LP* (2014) 222 Cal.App.4th 1228, 1242-1243 ["Because appellant did not object and had expressly approved the erroneous verdict form, it forfeited its claim that the special verdict is defective because the jury did not answer questions five and six."].) Plaintiff, however, cites authority to the effect that "waiver is not automatic, and there are many exceptions." (*Woodcock v. Fontana Scaffolding & Equipment Co.* (1968) 69 Cal.2d 452, 457, fn. 2; see *ibid.* ["[w]aiver is not found where the record indicates that the failure to object was not the result of a desire to reap a 'technical advantage' or engage in a 'litigious strategy' "; "waiver is not an issue where a defect is latent and there is no hint of 'litigious strategy' "]; but see *Keener v. Jeld-Wen, Inc.* (2009) 46 Cal.4th 247, 263-264, 270[" 'Failure to object to a verdict before the discharge of a jury and to request clarification or further deliberation precludes a party from later questioning the validity of that verdict if the alleged defect was apparent at the time the verdict was rendered and could have been corrected' " (citation & italics omitted); "*Woodcock*'s articulated exception to the waiver (forfeiture) rule for *ambiguous* verdicts" did not apply to incomplete polling of a juror].)

In any case, plaintiff's claim the special verdict was defective fails on the merits.

The text of the jury's special verdict appears in the margin.[1]  A reading of the verdict discloses no inconsistency, no ambiguity, and no issue unresolved that should

---

[1]     "**CLAIM No. 1**

"**Negligence and Premises Liability as to Magic Mountain Only**

"**1.  Was Magic Mountain negligent?**
"**Answer:     Yes**

"If your answer to question 1 is 'yes', then answer question 2.  If your answer to question 1 is 'no', then insert the number zero next to Magic Mountain's name in question 14, and then answer question 3.

"**2.  Was Magic Mountain's negligence a substantial factor in causing harm to Charles Rogers?**
"**Answer:     No**

"If your answer to question 2 is 'yes', then answer question 3.  If your answer to question 2 is 'no', then insert the number zero next to Magic Mountain's name in question 14, and then answer question 3.

"**CLAIM NO. II**
"**Products Liability – Failure to Warn as to S&S Worldwide Only**

"**3.  Did S&S Worldwide design, manufacture or sell the X2 vehicles?**
"**Answer:     Yes**

"If your answer to question 3 is 'yes', then answer question 4.  If your answer to question 3 is 'no', then insert the number zero next to S&S Worldwide's name in question 14, and if your answer to questions 1 or 2 was 'no', then stop, answer no further questions, and have the presiding juror sign and date this form.

"**4.  Did the X2 vehicles have potential risks that were known at the time of the design, manufacture and sale of the X2 vehicles?**
"**Answer:     No**

"If your answer to question 4 is 'yes', then answer question 5.  If your answer to question 4 is 'no', then answer question 9.

**[Questions 5-8 are omitted from this recitation because the jury answered "no" to question 4.  Those questions asked if the potential risks of the X2**

15

vehicles presented a substantial danger to plaintiff using the ride in a reasonably foreseeable way (Question 5); whether ordinary consumers would have recognized the potential risks (Question 6); whether S&S failed to adequately warn of the potential risks (Question 7); and whether the lack of sufficient warning was a substantial factor in plaintiff's injuries (Question 8).]

## "CLAIM NO. III
## "Products Liability – Design Defect as to S&S Worldwide Only

"9.  Was the design of the X2 vehicles a substantial factor in causing harm to Charles Rogers?
"Answer:    Yes

"If your answer to question 9 is 'yes', then answer question 10.  If your answer to question 9 is 'no', and your answer to any of the following questions – 3, 4, 5, 7 or 8 – are 'no', then insert the number zero next to S&S Worldwide's name in question 14, and if your answer to questions 1 or 2 was 'no', then stop, answer no further questions, and have the presiding juror sign and date this form. If your answer to question 2 is 'yes', then answer question 11.

"10.  Did the risks of the X2 vehicles outweigh the benefits of the design?
"Answer:    No

"If your answer to question 10 is 'yes', then answer question 11.  If your answer to question 10 is 'no', then insert the number zero next to S&S Worldwide's name in question 14, and if your answer to questions 1 or 2 was 'no', then stop, answer no further questions, and have the presiding juror sign and date this form.  If your answer to question 2 is 'yes', then answer question 11.

## "CHARLES ROGERS

"11.  Was Charles Rogers negligent?
"_____ Yes            _____ No

"If your answer to question 11 is 'yes', then answer question 12.  If your answer to question 11 is 'no', then insert the number zero next to Charles Rogers' name in question 14, and then answer question 13.

"12.  Was Charles Rogers's negligence a substantial factor in causing harm to himself?
"_____ Yes            _____ No

16

have been resolved.  Consequently, plaintiff cannot prevail on his claim of defect in the special verdict form.

The applicable principles are not in dispute.  "On appeal, we review a special verdict de novo to determine whether its findings are inconsistent." (*Singh v. Southland Stone, U.S.A., Inc.* (2010) 186 Cal.App.4th 338, 358.)  A special verdict is deemed

---

"If your answer to question 12 is 'yes', then answer question 13.  If your answer to question 12 is 'no', then insert the number zero next to Charles Rogers' name in question 14, and then answer question 13.

"**13.  What are Charles Rogers' total damages?  Do not reduce the damages based on the fault, if any of Charles Rogers.**

**"(a)  Past economic loss**
    **Past medical expenses**    **$ _____**
**"(b)  Future economic loss**
    **Future medical expenses**    **$ _____**
**"(c)  Past noneconomic loss**
    **Past pain and suffering**    **$ _____**
**"(d)  Future noneconomic loss**
    **Future pain and suffering**    **$ _____**

        **"Total**    **$ _____**

"If Charles Rogers has proved damages, then answer question 14.  If Charles Rogers has not proved damages, then stop here, answer no further questions, and have the presiding juror sign and date this form.

"**14.  What percentage of responsibility for Charles Rogers's harm do you assign to the following?  Insert a percentage for only those who received 'yes' answers in question 2, 8, 10 and 12.**

**"Magic Mountain:**    **0%**
**"S & S Worldwide:**    **0%**
**"Charles Rogers:**    **100%**
    **"Total:**    **100%"**

17

inconsistent when it is " 'beyond possibility of reconciliation under any possible application of the evidence and instructions.' [Citation.]" (*Oxford v. Foster Wheeler LLC* (2009) 177 Cal.App.4th 700, 716.) "Where the jury's findings are so inconsistent that they are incapable of being reconciled and it is impossible to tell how a material issue is determined, the decision is ' "against law" ' within the meaning of Code of Civil Procedure section 657. [Citation.]" (*Ibid.*) " 'The inconsistent verdict rule is based upon the fundamental proposition that a factfinder may not make inconsistent determinations of fact based on the same evidence.' [Citations.]" (*City of San Diego v. D.R. Horton San Diego Holding Co., Inc.* (2005) 126 Cal.App.4th 668, 682)

Accordingly, " ' " [w]here the findings are contradictory on material issues, and the correct determination of such issues is necessary to sustain the judgment, the inconsistency is reversible error.' " [Citations.]' [Citation.] 'The appellate court is not permitted to choose between inconsistent answers. [Citations.]' [Citation.] The proper remedy for an inconsistent special verdict is a new trial." (*Singh, supra,* 186 Cal.App.4th at p. 358.) And, "[a] special verdict is 'fatally defective' if it does not allow the jury to resolve every controverted issue." (*Saxena v. Goffney* (2008) 159 Cal.App.4th 316, 325.)

Here, plaintiff first contends the verdict is inconsistent because the jury found Magic Mountain to be negligent, and found S&S's design of the X2 vehicles a substantial factor in causing harm to plaintiff, "yet the jury allocated 100% responsibility to [plaintiff] without deciding whether [plaintiff] was negligent." The inconsistency, plaintiff says, is "[t]he failure to respond to [plaintiff's] contributory negligence [(questions 11 and 12)] but allocating 100% of the fault to him [(question 14)] . . . ."

Plaintiff misunderstands the law on inconsistent verdicts. The jury did, as plaintiff says, find that plaintiff was 100 percent responsible for the harm, without first finding he was negligent. But this is, at most, an irregularity, not an inconsistency in the verdict. The jury simply answered a question that it was not required to answer. The jury had already made factual findings that necessarily resulted in the conclusion that neither defendant was responsible for plaintiff's injuries. The jury found Magic Mountain's negligence was not a substantial factor in causing harm to plaintiff. That eliminated any

18

liability for plaintiff's injuries. The jury also found the X2 vehicles did not have known potential risks at the time they were designed (eliminating S&S's liability for failure to warn), and that the risks of S&S's design did not outweigh its benefits (eliminating S&S's liability for defective design). Since neither defendant had any responsibility for plaintiff's injuries, it does not matter whether plaintiff was negligent or not – he cannot recover from defendants. Thus plaintiff's assertion the special verdict is defective, because "[plaintiff's] contributory negligence is an ultimate fact for the jury that the jury failed to resolve," is without merit.

The jury's unnecessary allocation of 100 percent responsibility to plaintiff does not in any way contradict the jury's other findings, and indeed is entirely consistent with them. The jury's findings, resulting in no responsibility on the part of either defendant, rather obviously reflect the view that plaintiff was in fact responsible for his own injuries, and there was substantial evidence to support that view: he rode the X2 despite a history of blood clots, high blood pressure and back and groin pain for which he was then taking pain killers; there was testimony that the blood clotting was not caused by the bone fracture; and he did not seek prompt medical attention.

But in any event, as a legal matter, and as many courts have said, inconsistency in a special verdict is reversible error only where the findings are contradictory on material issues, " ' " 'and the correct determination of such issues is necessary to sustain the judgment . . . .' " [Citations.]' [Citation.]" (*Singh, supra,* 186 Cal.App.4th at p. 358.) That is not the case here; a correct determination of plaintiff's negligence or allocation of responsibility is immaterial, and unnecessary to sustain the judgment where defendants have no liability. (See *Contreras v. Goldrich* (1992) 10 Cal.App.4th 1431, 1434 ["the jury's special verdict finding the *lack* of proximate cause is dispositive of the defendant's *non*liability"; cases saying the jury must resolve every controverted issue refer "to every controverted issue *necessary to dispose* of liability"].)

Plaintiff proffers several other reasons for finding the special verdict defective.

First, plaintiff says the verdict is "irreconcilable with the evidence agreed to by the parties." He reasons that (1) as the jury was instructed, common carriers have a duty to

19

their passengers "to do all that human care, vigilance, and foresight reasonably can do under the circumstances" (*Lopez v. Southern Cal. Rapid Transit Dist.* (1985) 40 Cal.3d 780, 785 (*Lopez*)), and Magic Mountain is a common carrier (*Gomez v. Superior Court* (2005) 35 Cal.4th 1125, 1127, 1130, fn. 3 (*Gomez*)); (2) Magic Mountain stipulated it was feasible to exclude persons with paraplegia from the ride, so its breach of duty was "conclusively determined"; (3) "[c]ausation . . . was also determined" by Magic Mountain's stipulation that the fracture to plaintiff's leg was caused by the forces of the X2 ride; so (4) the jury's "only remaining function was to decide damages." But plaintiff's second and third premises are incorrect.

The flaw in plaintiff's analysis is apparent from the face of the stipulations: Magic Mountain did *not* stipulate that its failure to exclude paraplegic riders constituted negligence; and, more importantly, it did *not* stipulate that its negligence was a substantial factor in causing harm to plaintiff. On the contrary, Magic Mountain presented evidence that other persons with paraplegia rode the X2 without incident; that plaintiff should not have ridden the X2 because of preexisting medical conditions known only to him; and that the blood clots that resulted in amputation of plaintiff's leg were not caused by the fracture to his leg but by an unrelated, preexisting blood coagulation problem. Plaintiff's premise that plaintiff "received a femur fracture and developed a blood clot from it" assumes a fact that was for the jury to decide.

In sum, plaintiff's repeated assertion that Magic Mountain "stipulated as to causation" is unfounded. Magic Mountain stipulated only that the forces of the ride caused the fracture to plaintiff's femur – not that the ride caused the blood clotting and amputation of plaintiff's leg. Plaintiff nonetheless argues he sued for "'personal injuries to his right leg' without any qualifications," and his complaint "did not limit his damages to only the leg amputation." Therefore, the argument continues, "[d]uty, breach, and causation were all conclusively determined in favor of [plaintiff] with regard to the fracture," and "[i]t is unclear what harm the jury was referencing in its verdict." We see no lack of clarity. The language in plaintiff's complaint is irrelevant. The pertinent point is that plaintiff did not argue to the jury, or present evidence, that he was entitled to

20

damages for the broken femur alone. On the contrary, the entire case was based on the leg amputation that was necessitated by blood clotting. The bone fracture was relevant only if it caused the blood clotting that led to the amputation, and the jury apparently concluded, after extensive testimony on the point, that it did not. In short, there is no merit to the claim that Magic Mountain "stipulated as to causation," and no ambiguity in the jury's finding on that point.

Equally misplaced is plaintiff's reliance on the stipulation that it was feasible to exclude paraplegic riders from the X2. On the latter point, plaintiff contends that, because it was feasible to do so (exclude paraplegic riders), Magic Mountain breached its duty as a common carrier to "use the utmost care and diligence" (Civ. Code, § 2100) when it did not do so.[2] Ergo, plaintiff says, "Magic Mountain was liable to [plaintiff] as a common carrier with damages to be determined." Plaintiff cites no legal authority for this conclusion, which again ignores the causation finding, and we know of no legal rule suggesting a common carrier may be liable in damages for negligence even though its conduct does not contribute to the harm.

In short, the issues of negligence and causation were properly presented to the jury in the special verdict form. While the jury found Magic Mountain was negligent, it found the negligence was not a substantial factor in causing plaintiff's harm. " '[C]onduct is not a substantial factor in causing harm if the same harm would have occurred without that conduct.' [Citation.]" (*Lawrence v. LaJolla Beach & Tennis Club, Inc.* (2014) 231 Cal.App.4th 11, 33.) The jury was so instructed, and the issue was theirs to determine.

---

**2** "A carrier of persons for reward must use the utmost care and diligence for their safe carriage, must provide everything necessary for that purpose, and must exercise to that end a reasonable degree of skill." (Civ. Code, § 2100.) " 'Common carriers are not, however, insurers of their passengers' safety. Rather, the degree of care and diligence which they must exercise is only such as can reasonably be exercised consistent with the character and mode of conveyance adopted and the practical operation of the business of the carrier. [Citations.]' [Citation.]" (*Gomez, supra,* 35 Cal.4th at p. 1130, quoting *Lopez, supra,* 40 Cal.3d at p. 785.)

The claim the jury's findings on the negligence and causation issues were "irreconcilable" with the stipulated evidence is clearly mistaken.

Second, plaintiff complains that the jury finding that S&S Worldwide did not know of potential risks when the X2 vehicles were designed (question 4) is irreconcilable with its finding that the risks of the design did not outweigh the benefits (question 10). There is no contradiction. Questions 4 and 10 addressed two different claims. Question 4 addressed the failure to warn of potential risks known to S&S when the X2 vehicles were designed, manufactured and sold. The jury found there were no known risks. Question 10 addressed the design defect claim – an issue as to which S&S's knowledge of potential risks is irrelevant. So while the jury found the design of the vehicles harmed plaintiff (the parties stipulated the forces of the ride caused the fracture of plaintiff's femur), it then was required to weigh a number of factors, including the likelihood that the harm would occur, and found the risks of the design did not outweigh the benefits. We see no contradiction in any of these findings.

Third, plaintiff also appears to suggest some flaw in the lack of an answer to question 8. That question asked whether the lack of sufficient warnings by S&S was a substantial factor in causing harm to plaintiff. The jury did not answer that question because the verdict form instructed the jury, correctly, not to do so, if it determined in question 4 (as it did) that the X2 vehicles did not have potential risks known at the time they were designed, manufactured and sold. There is no duty to warn of unknown risks.

Finally, plaintiff contends the jury's verdict "was based on erroneous instructions which constitute a miscarriage of justice," and that "[m]ultiple errors misled the jury in this case." Specifically, he says: "The jury was improperly instructed to determine causation on Magic Mountain's negligence after causation had already been stipulated. The jury was also erroneously instructed as to primary assumption of the risk despite the judge having already determined that issue. The verdict form also contained instructional errors."

This claim has no merit either. Causation was not stipulated, as already discussed, and this mistaken contention is the basis for plaintiff's equally mistaken claim that the

22

verdict form contains instructional errors. (Plaintiff's repeated assertion that changes were made to the verdict form that were not agreed changes is simply false.) That leaves plaintiff's contention the jury "was also erroneously instructed as to primary assumption of the risk" even though the trial court had already decided that issue in its ruling on Magic Mountain's summary judgment motion. We necessarily reject this claim, both because plaintiff presents no analysis and cites no authorities to show the instruction was erroneous as a matter of law (and we accordingly may deem the argument waived), and because plaintiff makes no demonstration of prejudice from the instruction.

The background is this. The court denied Magic Mountain's summary judgment motion "because the Court finds that Magic Mountain . . . owed a duty to use the 'utmost care and diligence' for Plaintiff's safe carriage" as a carrier of persons for reward, citing Civil Code section 2100 and *Gomez*, *supra*, 35 Cal.4th 1125. The court stated that "the facts of this case do not support the primary assumption of the risk," and then quoted *Knight v. Jewett* (1992) 3 Cal.4th 296, 315-316 ("Although defendants generally have no legal duty to eliminate (or protect plaintiff against) risks inherent in the sport itself, it is well established that defendants generally do have a duty to use due care not to increase the risks to a participant over and above those inherent in the sport"). After describing the evidence presented by defendant and plaintiff, the court concluded: "Since the Court finds that a duty is owed, the issue remains as to whether that duty was breached," and found "there exist triable issues of material fact on the issue of whether an act or omission by Magic Mountain breached that duty."

At trial, during discussion of the instructions, the court said: "Next is CACI 408, which is primary assumption of the risk instruction. And I – I don't see why there would be any argument against that. I mean, it was an argument that was raised in summary judgment. I found there was a triable issue of fact. It seems like it's a factual issue for the jury. [¶] Just like I'm letting the plaintiff control their claims, which included the – you know, the warning and the defective design. This is an affirmative defense, and I don't see why it would not be given. [¶] Does the plaintiff want to be heard?"

23

Plaintiff's counsel replied, "No," and CACI No. 408 was given.**3**

In this appeal, plaintiff offers no analysis or argument that the instruction on assumption of the risk was improper as a matter of law, and cites no authorities on the point. He merely claims, in conjunction with his mistaken claims of instructional error on causation and in the special verdict form, that giving CACI No. 408 at trial was "also erroneous[]" because it contradicted the court's statement in its summary judgment ruling that "the facts of this case do not support the primary assumption of risk." But plaintiff cites no authority suggesting that an order denying summary judgment somehow binds the court in deciding what instructions should be given to the jury at trial. More to the point, the absence of any analysis or citation of authority waives any claim the instruction was erroneous as a matter of law. (*McComber v. Wells* (1999) 72 Cal.App.4th 512, 522 [if no legal argument with citation of authorities is furnished on a particular point, " 'the court may treat it as waived, and pass it without consideration.' "].) So, even if the trial court erred in giving the instruction (see *Nalwa v. Cedar Fair, L.P.* (2012) 55 Cal.4th 1148; *Gomez, supra,* 35 Cal.4th 1125), plaintiff waived that claim, and in any event failed to make the necessary demonstration of prejudice from the instruction (*Soule v. General Motors Corp.* (1994) 8 Cal.4th 548, 574).

2.     **The Sufficiency of the Evidence**

The substantial evidence standard "calls for review of the entire record to determine whether there is any substantial evidence**,** contradicted or not contradicted, to

---

**3**      The court instructed: "[Plaintiff] claims he was harmed while participating in riding the X2 ride and that Magic Mountain is responsible for that harm. To establish this claim, [plaintiff] must prove all of the following: [¶] 1. That Magic Mountain either intentionally injured [plaintiff] or acted so recklessly that its conduct was entirely outside the range of ordinary activity involved in riding the X2 ride; [¶] 2. That [plaintiff] was harmed; and [¶] 3. That Magic Mountain's conduct was a substantial factor in causing [plaintiff's] harm. [¶] Conduct is entirely outside the range of ordinary activity involved in riding the X2 ride if that conduct can be prohibited without discouraging vigorous participation or otherwise fundamentally changing the riding the X2 ride. [¶] Magic Mountain is not responsible for an injury resulting from conduct that was merely accidental, careless, or negligent."

support the findings below.  We view the evidence in the light most favorable to the prevailing party, drawing all reasonable inferences and resolving all conflicts in its favor. [Citation.]"  (*People ex rel. Brown v. Tri-Union Seafoods, LLC* (2009) 171 Cal.App.4th 1549, 1567.)

Plaintiff first argues there was insufficient evidence to support the jury's finding that Magic Mountain's negligence was not a substantial factor in causing harm to plaintiff.  Specifically, plaintiff claims reversal is appropriate because "there is a lack of substantial evidence establishing [plaintiff's] arterial clotting as being unrelated to the X2."  This is wrong, of course, because Dr. Flanigan expressly so testified.  He opined, in detailed testimony (*ante*, at pp. 7-9), that the diffuse blood clotting that ultimately led to the amputation of plaintiff's leg "had nothing to do with the ride forces," and instead was most likely caused by "[a] hypercoagulable state" causing plaintiff's blood to clot more readily.  Plaintiff acknowledges Dr. Flanigan's testimony, but argues that arterial blood clotting is different from clotting in the veins, and plaintiff only had a history of clots in the veins, not in the arteries, until he rode the X2.  But the evidence plaintiff cites does nothing to render Dr. Flanigan's testimony insubstantial.  All the evidence plaintiff cites was before the jury, and the jurors apparently found Dr. Flanigan's testimony persuasive. It is not our role to reweigh the evidence.

Next, plaintiff argues there was "overwhelming evidence . . . that S&S knew of the risks of the X2 to a paraplegic rider at the time of sale," and thus insufficient evidence to support the jury's contrary finding.  The "overwhelming evidence" plaintiff cites is that S&S "failed to do any testing on the effects of the X2 on a paraplegic person"; that in acceleration tests using water dummies to approximate human weight distribution, S&S strapped the dummies' legs; and that "whether a water dummy was put on the X2 or a paraplegic, . . . the legs would be subject to whatever forces the ride generated."  Plaintiff also cites Mr. Snyder's deposition testimony that one of the assumptions made in the design of the X2 ride was that "the passenger has control or functioning of the lower extremities."  And plaintiff points out that the X2 manual S&S provided to Magic Mountain removed language in the manual for the original X ride, which said:  "There

are most likely other persons who should not ride this ride due to various disabilities that are beyond the simple guidelines. The decision as to whether or not to allow the – to ride is solely the responsibility of the owner/operator of the ride."

We do not agree this is "overwhelming evidence" that S&S knew of potential risks to a paraplegic rider. More to the point, there was other pertinent evidence from which the jury could properly reach the contrary conclusion. Mr. Snyder explained his deposition testimony, stating that S&S did not change the restraint design when it redesigned the X2, and that the key item in restraint design in general is skeletal function. There was evidence that the X2 met all ASTM standards; that the designer of the original X ride did not restrict persons with paraplegia from riding; that the X ride was "service-proven with over five years of acceptable ridership"; and that the reason the legs of the water dummies were strapped during the tests was to prevent the hard plastic of the dummies from rubbing and taking the finish off the seats of the vehicles.

In short, there was ample evidence from which the jury could properly conclude that S&S was unaware of potential risks at the time the X2 vehicles were designed.

Finally, plaintiff contends there was insufficient evidence "to support a determination that [plaintiff] is 100% at fault." This is merely a reiteration of arguments we have already discussed and rejected. There was ample evidence to support such a determination, which was in any event immaterial to the verdict. The relevant point is that the jury found facts, supported by substantial evidence, that required the legal conclusion that neither defendant was liable for plaintiff's injuries. That is necessarily the end of the story.

**DISPOSITION**

The judgment is affirmed. Defendants shall recover their costs on appeal.


GRIMES, J.

We concur:


BIGELOW, P. J.                          RUBIN, J.

26